422 A.2d 148

COMPUTER PRINT SYSTEMS, INC.

v.

David A. LEWIS, Victor S. Liss and C. P. C. Associates, Inc., Appellants.

Superior Court of Pennsylvania.

Argued June 6, 1979.

Filed Oct. 10, 1980.

Benjamin E. Zuckerman, Norristown, for Victor S. Liss and C. P. C. Associates, Inc., appellants at No. 2841 and appellees at No. 3016.

Anthony R. Thompson, Allentown, for Computer Print Systems for appellee at Nos. 2841 and 3016.

Kenneth R. Williams, Doylestown, for David Lewis, appellee.

Before PRICE, GATES and DOWLING, JJ.*

PRICE, Judge:

This appeal is from an action in equity by appellee for conspiracy to usurp a corporate opportunity and for conversion of computer programs. The chancellor denied appellee's request for a preliminary injunction restraining appellants from utilizing the computer programs, and on the trial on the merits, he found no support for the conspiracy charge but entered judgment for $18,000, representing the value of the computer programs appropriated by appellants. Appellants now appeal alleging numerous instances of error. Finding no merit to these contentions, we affirm the order in the trial court.

Appellants' first contention on appeal is that there was a variance between the allegata and probata which mandates entry of judgment non obstante veredicto. The evidence presented at trial established that appellee is a data processing service company specializing in the field of direct mail advertising and the development of computer programs to accomplish the direct mail requirements of its clients. Appellant David Lewis (Lewis) was an officer of appellee serving as administrative manager and vice–president from May of 1973 until January 1975 and thereafter as its president until May 7, 1976. Appellant C. P. C. Associates, Inc. (CPC) was a customer of appellee from 1973 until May 1976,

---

* President Judge G. THOMAS GATES of the Court of Common Pleas of Lebanon County, Pennsylvania, and Judge JOHN C. DOWLING of the Court of Common Pleas of Dauphin County, Pennsylvania, are sitting by designation.

and appellant Victor Liss (Liss) was CPC's president and one of its principal shareholders. Another individual, Kurt Schneider (Schneider), is the sole shareholder of appellee and also figured prominently in the proof at trial.

From 1973 until 1976, Lewis was extensively involved in the day to day operations of appellee and maintained exclusive control over the management of the CPC account. This control entailed the processing of the monthly direct mailing requirements of CPC and was accomplished by specialized computer programs.[1] In January 1975, Lewis requested permission to make copies of the computer programs used to process the CPC account and to deliver them to CPC as a precaution against fire. Schneider refused this request, stating that it was against company policy to give copies of programs developed by appellee to its customers, which policy served as an inducement to prevent the customers from taking their account to another computer processor.

In or about June of 1975, another company in which Schneider owned 100% of the stock encountered financial difficulties and ceased activity. As a result, Liss became fearful that a similar fate would befall appellee, thus forc-

1. CPC had as clients a number of department and specialty stores located in various portions of the country. These stores wanted to identify individuals who had recently moved to an area in the vicinity of the particular store in order to target those individuals as potential customers. To accomplish this purpose, CPC purchased subscription lists from several magazine publishing companies. Through manipulation of these lists, appellee was able to identify those persons who had recently moved and it therefore was able to print the names of these individuals and mail to them pertinent literature from stores in the area that subscribed to CPC's services. Appellant Liss testified that it was extremely important to CPC's clients that the mailing be achieved as expeditiously as possible after they learned of the new potential customer in order to contact them before their shopping habits became established and before they were contacted by competing stores. Thus, a rigid timetable for each month's mass mailing was established. As examples of the specialized programs designed to process the CPC account, Schneider testified that an "unduplicating" program was developed to prevent duplicate mailing to individuals who subscribed to more than one magazine and whose name therefore appeared on more than one list, and a zip code program designed to identify those persons who lived within a particular zip code district.

ing a disruption of CPC's monthly mailing operation. Consequently, Liss informed Lewis that unless CPC could acquire "backup" copies of the computer programs used to process its work, it would take its account to another company. In response, Lewis procured taped copies of the programs along with machine code instructions without informing Schneider and turned them over to Liss in June of 1975. At that time, Liss did not know that it was contrary to appellee's corporate policy for Lewis to supply these items. Liss obtained the items but did not use them and continued to maintain the CPC account with appellee.

In January of 1976, Lewis expressed dissatisfaction with his position with appellee and commenced discussion with Schneider regarding a termination of his employment. In March of that year, he submitted to Schneider his resignation but remained with CPC until May 7, 1976. At or about the beginning of April 1976, Liss discovered for the first time that Lewis was terminating his relationship with appellee. Somewhat concerned, he sought to induce Schneider to retain Lewis by threatening to take his account to a competing computer processor if Lewis was not available to manage the CPC account. Apparently, Liss was concerned that the CPC account would not receive the individualized attention that had been the hallmark during Lewis' tenure with appellee. When these efforts failed, and unbeknownst to Schneider, Liss contacted Lewis on April 20, 1976, and agreed to hire Lewis to process the CPC account as an independent consultant. Lewis agreed, and in preparation for this task, he purchased several blank computer tapes. On April 23, 1976, he utilized the facilities of appellee to run a test of the blank tapes to determine that they were in good condition. For some unexplained reason, however, the log that records the use of the computer at appellee's facility was torn so as not to reflect this use by Lewis on April 23, 1976.

On May 1, 1976, Schneider learned for the first time that Lewis was to take over the processing of the CPC account. By correspondence dated May 4 and May 14, 1976, Liss

instructed Schneider to relinquish to Lewis the programs and all other material used to process the CPC account. Schneider did not respond to these letters, and on May 17, 1976, a "final settlement" meeting was held, attended by Lewis, Liss and Schneider. At that meeting, Schneider refused to deliver the material and for the first time informed Liss that the programs were the exclusive property of appellee and did not belong to CPC. At no time did either Lewis or Liss reveal that CPC still retained the copies of the programs obtained in June of 1975. After the meeting, Lewis also informed Liss that in his assessment the tapes and other material did not belong to CPC, but Liss responded by telling Lewis "not to worry about it."

The next day, May 18, 1976, Liss turned the backup tapes over to Lewis who secured the services of an independent computer processing company and, with the benefit of the 1975 backup tapes, was able to develop new programs to process the CPC account in time for the direct mailing at the end of May. Shortly thereafter, Schneider learned that the computer at appellee's office had been utilized on April 23, 1976, and that this use was not reflected in the computer log. This, plus the knowledge that Lewis had developed programs to process the CPC account in an extremely short period of time, led Schneider to suspect that Lewis had appropriated copies of the CPC tapes in April 1976 as part of a conspiracy to usurp the CPC account at a time when he still maintained his contacts with appellee and had access to its facilities.

On June 8, 1976, appellee filed suit charging appellants with conversion of the CPC tapes and conspiracy to have Lewis breach his fiduciary duty as an officer of appellee and to usurp appellee's corporate opportunity. The complaint was verified by Schneider and proceeded upon the premise that appellants had been conspiring to divert the CPC account from appellee from the time Lewis first contemplated terminating his employment relationship with appellee in January 1976, until the final negotiations in April 1976, and that Lewis had converted copies of the CPC programs in

furtherance of the conspiracy. Not until after the complaint had been filed did Schneider discover the correct account of how CPC had obtained copies of the computer programs. At the termination of trial the chancellor concluded that the evidence was insufficient to support the allegation regarding the usurpation of the corporate opportunity,[2] but entered a verdict on the claim for conversion of the computer programs.

Appellants' first contention on appeal is that the variance between the allegation in the complaint that they procured copies of the computer programs in a surreptitious manner during the period from January 1 to May 1, 1976, and the actual evidence adduced at trial that the program tapes were obtained in June 1975 requires a reversal. We disagree.

First, we note that appellee was afforded numerous opportunities by appellants during the course of trial to rectify the alleged variance by amending its complaint, but declined, stating that in its assessment the complaint did not restrict the allegation of conversion to the specific time period from January 1, to May 1, 1976. Without dissecting the separate allegations in appellee's complaint to determine if the conversion theory was specifically restricted to the time frame alleged by appellants, we hold that even if appellee's complaint is interpreted as so limited, we would decline to enter judgment non obstante veredicto in the instant case.

■ The general rule requiring conformity between the allegata and probata is intended to avoid the injustice that would result by confronting a defendant at trial with proof of a cause of action of which he was not put on notice and which he is not prepared to defend. *See, e. g., Freer v. Parker*, 411 Pa. 346, 192 A.2d 348 (1963); *Willinger v. Mercy*

2. The chancellor concluded that even if a conspiracy to usurp the corporate opportunity had existed, it would be of no effect in the instant case since appellee did not have a contract obligating CPC to utilize its services and the value of the CPC account to appellee was only nominal.

*Catholic Medical Center of Southeastern Pennsylvania, Fitzgerald Mercy Division,* 241 Pa.Super. 456, 362 A.2d 280 (1976), *aff'd,* 482 Pa. 441, 393 A.2d 1188 (1978). The rule will not be employed, however, to create a mere technical impediment to frustrate the administration of justice, *Hrivnak v. Perrone,* 472 Pa. 348, 372 A.2d 730 (1977); *Domineck v. Tuskan,* 201 Pa.Super. 608, 193 A.2d 626 (1963), and one of the most important considerations is whether the defendant was misled or surprised in his preparation and presentation of the case by the variance. *See Freer v. Parker, supra; Smith v. Allegheny County,* 397 Pa. 404, 155 A.2d 615 (1959); 4 Std.Pa.Prac. 479–80 (1955).

■ As appellee correctly notes, appellants were neither surprised nor misled since they were initially aware of any variance, and indeed, it was appellee who was not informed of the manner and time during which appellants acquired the tapes until initiation of discovery procedures. In such a circumstance, an appellate court will not reverse for a variance in the allegata and probata that could have been rectified by an amendment even if the offending plaintiff failed to comply with the technical procedure for amending the complaint. *See Srednick v. Sylak,* 343 Pa. 486, 23 A.2d 333 (1941); *Saint Vladimir Ukranian Orthodox Church v. Preferred Risk Mutual Ins. Co.,* 239 Pa.Super. 492, 362 A.2d 1052 (1976); *Flynn v. Rodkey,* 192 Pa.Super. 56, 159 A.2d 265 (1960). Therefore, assuming *arguendo* that appellee's complaint does create a variance, we decline to enter judgment non obstante veredicto in the instant case.

Appellants Liss and CPC next contend that they are not guilty of conversion because: (1) appellee did not have a proprietary interest in the computer programs; (2) the initial acquisition of the programs from Lewis was innocent and based upon a presumption of apparent authority; and (3) they paid for and thus had an ownership interest in the tapes and all other materials developed by appellee in servicing the CPC account.

 In addressing appellant's first claim, the chancellor concluded that appellee had a legally protected interest in the items taken "since the programs represented a substantial investment of time and money by [appellee] and a device of importance to the continuing operation of [appellee's] business." (Opinion at 17). In so ruling, the chancellor rejected appellee's initial claim that the programs were trade secrets, but failed to specify upon what basis he concluded they should not be so classified.[3] Instead, the

**3.** Some of the factors to be considered in determining if an item qualifies as a trade secret are listed in the Restatement of Torts § 757, comment *b* (1939):

"(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*See Cudahy Co. v. American Laboratories, Inc.,* 313 F.Supp. 1339 (Neb.1970).

After extensive review of the record, we conclude that the only reasonable basis upon which the programs could be challenged as not being trade secrets is that of public knowledge. Although the testimony at trial on this subject was scarce, it was established that the programming knowledge needed to create these programs was not unique, and that the programs developed to process the CPC account could have been duplicated by any skilled programmer willing to invest approximately four months of work and computer services at a cost of $18,000. Testimony also established that other competitors had developed programs to achieve similar results although special modification of their programs would have been required to process the CPC account.

In light of this evidence, we conclude that although the "concept" of developing computer programs to expedite direct mail advertising and the computer programming expertise necessary to develop the programs were public knowledge and not subject to trade secret protection, *see Van Products Co. v. General Welding and Fabricating Co.,* 419 Pa. 248, 213 A.2d 769 (1965); *Pittsburgh Cut Wire Co. v. Sufrin,* 350 Pa. 31, 38 A.2d 33 (1944), the specific programs developed by appellee to accomplish this purpose should be afforded such protection. Novelty and uniqueness are not prerequisites for trade secret protection, *see* Restatement of Torts § 757, comment *b* (1939), and "[t]he fact that others might do similar work, if they might, does not authorize them to steal plaintiff's." *Board of Trade of Chicago v. Christie Grain & Stock Co.,* 198 U.S. 236, 250, 25 S.Ct. 637, 639, 49 L.Ed. 1031 (1905). Rather, the fact that competitors could duplicate

chancellor merely concluded that the programs were general chattels and that appellants should be required to pay for their use under the Restatement of Restitution § 1 (1937): "A person who has been unjustly enriched at the expense of another is required to make restitution to the other."

In this appeal, appellants dispute the conclusions of the chancellor in two respects. First, they allege that computer programs are the type of property that would qualify as trade secrets.[4] *See University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974); *Telex Corp. v. International Business Machines Corp.*, 367 F.Supp. 258 (N.D.Okl.1973), *aff'd. in part and ref'd. in part*, 510 F.2d 894 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); *Electronic Data Systems Corp. v. Kinder*, 360 F.Supp. 1044 (N.D.Tex.1973), *aff'd.*, 497 F.2d 222 (5th Cir. 1974); *Com–Share, Inc. v. Computer Complex, Inc.*, 338 F.Supp. 1229 (E.D.Mich.1971), *aff'd.*, 458 F.2d 1341 (6th Cir.

the product through investment of their own funds and application of general programming principles does not preclude trade secret protection for one who has invested such effort. *See Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894 (10th Cir.), *cert. denied*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975) (computer software); *Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d 386 (8th Cir. 1973) (blue prints); *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838 (1957) (customer list); *Pressed Steel Car Co. v. Standard Steel Car Co.*, 210 Pa. 464, 60 A. 4 (1904) (blue prints).

In light of the considerable investment and the competitive advantage obtained by appellee through development of the computer programs, we conclude that they were trade secrets. Indeed, we note an inconsistency in that the authorities relied upon by the chancellor in concluding that appellee had a protectable interest in the chattels, *Telex Corp. v. International Business Machine Corp., supra; Nucor Corp. v. Tennessee Forging Steel Service, Inc., supra; Business Supplies Corp. of America v. Conole*, 41 D. & C.2d 101 (C.P. Monroe 1960), all involved trade secrets, yet the chancellor concluded that the computer programs did not enjoy that status.

4. In this respect we note that appellants' contention on appeal is contrary to that presented at trial. At trial, appellants attempted to establish that the programs and programming skills used to develop them were public knowledge and not sufficiently novel to qualify as trade secrets. Having lost at trial, they now concede that novelty is not required and that the programs would otherwise qualify as trade secrets, but that appellee failed to meet one of the other criteria for such protection, *viz.*, continued secrecy.

1972). Second, they challenge the chancellor's conclusion that appellee had a protected property interest in the instant case. Rather, they allege that although the programs would normally be protected as trade secrets, appellee failed to take adequate precautions to prevent public disclosure by its employees thus precluding continued trade secret protection in the instant case. Unfortunately, appellants failed to specifically allege these challenges in their exceptions to the chancellor's decree and their boiler–plate exception that appellee did not have "any legally protected interests in the computer programs in question" cannot be construed as encompassing the allegations presented in this appeal. Pa. R.C.P. No. 1518.

■■■ Moreover, even assuming that the programs would otherwise be protected as trade secrets, appellants' challenge to that continued status on the basis of public disclosure by appellee's officer is misplaced. While continued secrecy is the *sine qua non* to maintenance of trade secret protection, *see, e. g., Greenberg v. Croydon Plastics Co.*, 378 F.Supp. 806 (E.D.Pa.1974); 12 Business Organizations, Milgrim, Trade Secrets §§ 2.03, 2.04 (1978) (hereinafter *Milgrim*), the issue in the instant case is not whether the precautions utilized by appellee were reasonable, but whether a confidential relationship existed such that appellee's officer was prohibited from disclosing the trade secrets revealed by appellee during the confidential employment relationship. If the trade secrets were acquired through breach of that relationship, appellants would be subject to liability for their unlawful acquisition. Restatement of Torts, § 757 comment *j* (1939). As stated by our supreme court:

> "The duty of the servant not to disclose the secrets of the master may arise from an express contract, or it may be implied from their confidential relations. It is likewise true that other persons who induce such disclosures by an employee, knowing of his contract not to disclose, or knowing that the disclosure is in violation of the confidence reposed in him by his employer, will be enjoined from making use of the information so obtained. Where

confidence is reposed, and the employee by reason of the confidential relation has acquired knowledge of trade secrets, he will not be permitted to make disclosure of those secrets to others to the prejudice of his employer." *Macbeth–Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 85–86, 86 A. 688, 691 (1913).

See *Van Products Co. v. General Welding and Fabricating Co., supra; Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960); *Morgan's Home Equipment Corp. v. Martucci, supra; Belmont Laboratories Inc. v. Heist*, 300 Pa. 542, 151 A. 15 (1930); Restatement (Second) of Agency, §§ 395, 396 (1958). Thus, in light of the reasonable assumption that its employees and officers would abide by their obligation not to disclose its trade secrets, we cannot conclude that appellee's failure to employ more elaborate precautions to prevent disclosure precludes continued attachment of trade secret protection.[5]

Appellants Liss and CPC next contend that they cannot be guilty of converting appellee's computer programs because their initial acquisition of the backup tapes was innocent and without knowledge that it was in violation of appellee's corporate policy. In dismissing this claim, the chancellor relied upon comment *c* to the Restatement of Restitution § 123 (1937) which provides that a party is guilty of conversion if he innocently acquired possession of chattels without giving value and thereafter learns of the superior interest of another but fails to make restitution. While certainly persuasive, we believe that because the programs are trade secrets,[6] the correct provision is found in Restatement of Torts § 758(b) (1939), which in substance repeats the provi-

---

**5.** While appellants have drawn our attention to one other case in which a company employed elaborate precautions to prevent unauthorized access to computer programs, *Com–Share, Inc. v. Computer Complex, Inc., supra*, we note that in that case, plaintiff had voluntarily disclosed portions of its programs through a technology pooling agreement. Obviously, this was not the case in the instant proceeding in which the programs were to remain "in house" and appellee could reasonably rely upon the duty imposed on its employees and officers not to reveal confidential information.

**6.** *See* note 3, *supra*.

sions of § 123 of the Restatement of Restitution and states as follows:

> "One who learns another's trade secret from a third person without notice that it is secret and that the third person's disclosure is a breach of his duty to the other, or who learns the secret through a mistake without notice of the secrecy and the mistake,
>
> . . . . .
>
> (b) is liable to the other for a disclosure or use of the secret after the receipt of such notice, unless prior thereto he has in good faith paid value for the secret or has so changed his position that to subject him to liability would be inequitable."

■ Thus, while appellants Liss and CPC were not cognizant of the confidential nature of the computer tapes when they initially acquired possession in June of 1975, their use of the programs subsequent to the "final settlement" on May 17, 1976, when such information was made known to them, subjects them to liability for trade secret infringement at that time.

■ Appellants claim, however, that they fit within the exception in subsection (b) of § 758 in that they "paid value" for the tapes in June 1975 and therefore were entitled to utilize the tapes in processing their work. In this respect, appellants claim that their action in continuing to bring the CPC account (worth approximately $20,000 per month) to appellee subsequent to June 1975 provided consideration for Lewis' business decision to provide Liss and CPC with a backup copy of the programs. While it is true that the business arrangement between appellee and CPC was at will and that CPC was free to place its account with any other computer processor, we do not believe that the agreement between Lewis and CPC in June of 1975 to provide the backup tapes as a means of alleviating Liss' insecurity regarding the continued business operation of appellee served as authorization for CPC to utilize the programs

under any other conditions.[7] *Cf. College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200 (1976); *Pressed Steel Car Co. v. Standard Steel Car Co., supra* (use of disclosed trade secret limited to restrictions placed upon disclosure).

Appellants Liss and CPC also contend that CPC paid value for the programs by reason of the billing procedures utilized by appellee. In this respect, the chancellor observed that the initial agreement establishing the business relationship between appellee and CPC was loosely structured and did not delineate the rights of the parties to the programs developed in servicing the CPC account. Thus, the terms of the oral agreement must be developed from the probable intent of the parties as evidenced by their course of conduct as reflected in the billing process. *See Fenestra Inc. v. John McShain, Inc.*, 433 Pa. 137, 248 A.2d 835 (1969); *Amerofina, Inc. v. U. S. Industries, Inc.*, 232 Pa.Super. 394, 335 A.2d 448 (1975).

Testimony at trial established that there are two methods in the computer service industry for assessing customers for the cost of developing computer programs. Assessment is made either by a direct charge for the costs incurred in developing the programs or, employing the method utilized by appellee, of not charging for the initial costs of development, but instead charging a premium "running charge" each time the programs must be utilized in processing work for the customer.[8] Under the latter method, the expectation

7. Even assuming that appellee had encountered financial difficulty and was unable to continue to process the CPC account, we question whether CPC could have utilized the trade secrets. Trade secrets have been declared to be property in Pennsylvania, *see Wexler v. Greenberg, supra; Morgan's Home Equipment Corp. v. Martucci, supra; Pressed Steel Car Co. v. Standard Steel Car Co., supra,* and would have passed to appellee's trustee in bankruptcy under § 70 of the then applicable bankruptcy act, 11 U.S.C. § 110, *repealed and replaced by* 11 U.S.C. § 541(a). *See Milgrim, supra,* § 1.07.

8. The chancellor also found that appellee on occasion assessed a $50.00 "single application charge" when an unusual program was required to process the CPC account, but was not utilized on a regular basis in performing the work for CPC.

of the service company is that the costs of development will be recovered through the premium charged for each subsequent run.

■ Appellants Liss and CPC argue that because the CPC account was maintained with appellee for a period of four years, the premium that CPC paid for each computer run was more than sufficient to offset the costs of development and thus CPC had an ownership interest in the programs. We disagree, for as the parties acknowledged, the billing procedure utilized by appellee involved a risk that the customer would not maintain its account with it for a sufficient period of time to permit appellee to recoup the costs of development. Thus, because the initial arrangement served to provide a windfall to appellee, Liss and CPC cannot now reverse their decision post factum upon learning that the decision was not as advantageous as originally contemplated. If Liss and CPC had desired to purchase the programs from appellee, they should have contracted to that effect at the commencement of the business arrangement. Not having done so, they cannot now complain that the billing procedure used should be construed as vesting an ownership interest on the basis that the total charges ultimately paid would have been sufficient to purchase the programs initially.

Finally,[9] appellants contend that the trial court erred in its assessment of damages. The chancellor determined that appellee had established a conversion of the computer programs in the value of $18,000 and awarded judgment in that amount. In so ruling, he took note of the two measures of damages in an action for conversion: (1) the loss by plaintiff measured by the value of the item converted; and (2) unjust enrichment measured by the value of the converted chattel to the defendants. See Diesel v. Caputo, 244 Pa.Super. 195,

9. Appellant Liss also contends that he cannot be held personally liable because he acted at all times in his role as a corporate officer and did not benefit personally from the appropriation of the computer tapes. We find, however, that this issue has not been preserved for appellate review since Liss failed to present it in his exceptions to the chancellor's decree. Pa.R.C.P. No. 1518.

366 A.2d 1259 (1976). The chancellor concluded that the $18,000 cost of developing the programs was the proper amount applicable under both theories of recovery. Appellants dispute this conclusion and allege that the evidence was insufficient to establish a proper measure of damages.

First, they contend that $18,000 does not represent the value of appellee's loss because appellee was not actually deprived of the programs and was free to utilize them in serving other customers. We find this contention to be meritless as it ignores the fact that the value to appellee in its exclusive possession of the programs was as a protection for the time and expense it had invested in developing the completed programs. Because of this investment, appellee had a valuable product that it presumably could have sold to other parties, in this case CPC, which desired to obtain the product in its completed form rather than expending its own resources to develop the same product independently. We therefore believe that the evidence supports a determination that appellants' appropriation of the programs resulted in a loss to appellee of an interest in the value of $18,000.

In addition, we believe that appellee presented sufficient evidence to support the conclusion that the value of the programs to appellees was in a similar amount. With the aid of the backup tapes, Lewis was able to design programs to service the CPC account within approximately ten days as opposed to the estimated three weeks to four months that would have been required without the aid of the tapes. By their use, CPC was able to complete its direct mailing for the month of June without interruption of service. Thus, even applying the "standard of comparison" test urged by appellants, *see Telex Corp. v. International Business Machine Corp.*, 510 F.2d 894 (10th Cir.), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975), between the cost that CPC would have incurred if it had not utilized the backup tapes, minus the actual costs incurred through their use, the measure of damages would remain $18,000. Moreover, the conflicting testimony of appellants' witnesses regarding the alleged limited use of the backup tapes is an issue of

credibility and was for resolution by the chancellor whose finding will not be reversed on appeal. *See, e. g., Felmlee v. Lockett,* 466 Pa. 1, 351 A.2d 273 (1976); *Murrer v. American Oil Co.,* 241 Pa.Super. 120, 359 A.2d 817 (1976).

The order in the trial court is affirmed.