**HEALTHCARE AFFILIATED SERVICES, INC., and Blue Cross of Western Pennsylvania, Plaintiffs,**

v.

**Leslie V. LIPPANY, individually and doing business as Hospital Microsystems, Inc., Defendant.**

Civ. A. No. 88–1240.

United States District Court,
W.D. Pennsylvania.

Aug. 11, 1988.

**1144**

Arthur J. Schwab and Pamela A. McCallum, Stephen J. Birek, Corporate Counsel, Blue Cross of Western Pennsylvania, Pittsburgh, Pa., for plaintiffs.

David Hanson, Pittsburgh, Pa., Patrick Rega, Charleroi, Pa., for defendant.

## FINDINGS OF FACT

BLOCH, District Judge.

### A. The Parties

1. Plaintiff, Healthcare Affiliated Services, Inc. (HAS), is a Pennsylvania corporation with its principal place of business at 301 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

2. Plaintiff, Blue Cross of Western Pennsylvania (Blue Cross), is a Pennsylvania corporation with its principal place of business at One Smithfield Street, Pittsburgh, Pennsylvania 15222. HAS is a wholly-owned subsidiary of Blue Cross.

3. Defendant Leslie V. Lippany (Lippany) is an individual residing at 474½ Woodland Road, Pittsburgh, Pennsylvania 15237.

4. Lippany has done business or is doing business in whole or in part as "Hospital Microsystems, Inc." (HMI).

### B. Plaintiffs' Business and Systems

5. At all times relevant to this action, plaintiffs have been in the hospital management consulting business, engaged in researching, designing, packaging, marketing, selling and installing manual and computerized systems in hospitals, nursing homes and other health care institutions to increase operational efficiency, perform cost accounting services, install cost accounting systems and provide management support.

6. Plaintiffs have developed a product line of fully and partially computerized hospital productivity, cost management, and other decision support systems. Five of these systems, incorporating four software programs, are at issue in this action.

7. A computer program is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

8. The structure, sequence and organization of a computer program consists of the manner in which the program operates, controls and regulates the computer in receiving, assembling, calculating, retaining, correlating and producing useful information.

9. Plaintiffs' Objective Management Information System (OMIS) is a computerized departmental staffing control system. The first generation (OMIS I) is a mainframe version. The second generation (OMIS II) is a micro-computer version.

10. On April 12, 1988, HAS was granted copyright registration No. 314981 for the OMIS II system software and, on April 27, 1988, was granted copyright registration No. 316851 for the OMIS II system manual.

11. Plaintiffs' Staff Leveling System (SLS) is a partially computerized, acuity-based nurse staffing system. The input for SLS is manual; all other aspects of SLS are computerized. Input is accomplished via input forms.

12. On April 27, 1988, HAS was granted copyright registration No. 316856 for the SLS software and copyright registration No. 316852 for the SLS manual.

13. Plaintiffs' Surgical Block Scheduling System (SBSS) is a partially computerized system; the system consists of a number of formulas. The sequence of formulas is designed to produce surgical block schedules. SBSS is based on an analysis of surgical case histories for individual surgeons at a given hospital.

14. The computerized aspect of SBSS is plaintiffs' Computerized Operating Room Data Analysis (CORDA) System, which organizes the surgical case history analyses for the surgeons. After the data is collected and organized in accordance with CORDA, it is worked through plaintiffs' SBSS.

15. On April 27, 1988, HAS was granted copyright registration No. 316857 for the CORDA system software and copyright registration No. 316853 for the CORDA system manual.

16. No copyright registration has been granted for SBSS itself.

17. Plaintiffs' Standard Cost Accounting System (SCAS) is a procedure-level engineered standard-based cost accounting system. The system is computerized; input to the system may or may not be manual depending upon whether the hospital has an HAS information system for the preliminary data processing.

18. On April 27, 1988, HAS was granted copyright registration No. 316855 for the Standard Cost Accounting System software and copyright registration No. 316854 for the Standard Cost Accounting System manual.

19. In order to research, develop, enhance, market and sell these five systems, plaintiffs have compiled and used inhouse information which has been developed over the years as a result of the combined efforts and contributions of a variety of professionals employed by plaintiffs including, among others, industrial engineers, nurses, cost accountants, management engineers, and system analysts.

20. The five systems were developed by plaintiffs' employees during their employment.

21. Plaintiffs have attained, and can only maintain, their present competitive status in the industry by developing and confidentially maintaining information concerning their systems and the associated methodologies.

22. Plaintiffs are considered a leader in the field of hospital management consulting in large part because they offer a complete line of manual and computerized hospital management systems.

23. Plaintiffs have taken measures to maintain the confidentiality of their systems and the associated methodologies; these measures include employment agreements containing confidentiality and non-competition provisions, conflict of interest disclosure forms, which are to be completed by the employee on an annual basis, security access codes for computer information, physical security of the premises, verbal communications to employees regarding the confidentiality of information, withholding the publishing of the systems or the detailed methodology of the systems, and restricting internal disclosure of information on a need-to-know basis. Plaintiffs have not released the methodologies of their systems to the public.

24. Plaintiffs have required their employees to enter into employment agreements which prohibit the employees from disclosing plaintiffs' confidential information to the public and/or to competitors of plaintiffs. Confidential information, within the meaning of the agreements includes, *inter alia,* customer lists, information regarding customer needs and requirements, knowledge relating to existing software and software under development, marketing plans, and information relative to the business and affairs of plaintiffs' customers, which information plaintiffs have not made available to the general public.

## C. Defendant's Employment with Plaintiffs

25. Lippany was hired by Blue Cross on May 14, 1973, as a consultant in its Consulting Department. At the time he was hired, he had no experience in or knowledge of the hospital management consulting business and related manual and computerized systems, products and services.

Lippany's knowledge of this area was developed during and because of his employment with plaintiffs.

26. From May 14, 1973 until January 22, 1988, Lippany continued in plaintiffs' employment. During the 15 years of his employment with plaintiffs, Lippany was in a relationship of trust and confidence with plaintiffs and had possession of valuable and confidential information including, *inter alia*, plaintiffs' systems, methodologies, business plans and procedures, and client information.

27. At all times during his employment with plaintiffs, Lippany had intimate knowledge of and responsibility for the research, development, design and enhancement of plaintiffs' methodologies and systems, including, specifically, the five systems at issue herein and their associated methodologies.

28. Lippany had the responsibility for enhancing plaintiffs' OMIS and SCAS systems.

29. In addition, Lippany had principal responsibility for writing the specifications to fully automate, i.e., computerize, on a personal computer, plaintiffs' semi-automated SLS system and plaintiffs' manual SBSS.

30. Lippany was the primary author of plaintiffs' SBSS and was given the specific responsibility of automating the system.

31. Lippany developed the SBSS during his employment with plaintiffs.

32. On June 1, 1987, Lippany signed a written employment agreement with HAS in connection with his promotion to manager. Lippany received an increase in salary in connection with this promotion.

33. Under the terms of paragraph 1 of this agreement, Lippany agreed to protect and preserve the confidentiality of HAS's confidential information, which was defined to include all information concerning the business or affairs of HAS not generally available to the public at large, including, but not limited to, customer lists, customer needs and requirements, knowledge relating to existing software and software under development, marketing plans, pricing information and employee lists, salaries and benefits.

34. Confidential information, under the terms of the agreement, was also defined to include information relating to the business and affairs of persons and entities with whom HAS has business relations, which information is not generally available to the public at large and which information is made available to the employee in the course of his/her employment by HAS.

35. Under the terms of the agreement, Lippany further agreed that HAS had the sole and exclusive proprietary right to any and all products, processes, methodologies and services, including, but not limited to, systems and software developments and improvements, developed by Lippany alone or in conjunction with other persons, during his employment with HAS.

36. During his employment with plaintiffs, Lippany was in contact with plaintiffs' clients and potential clients, privy to their confidential information, and had intimate knowledge of and responsibility for the development and enhancement of plaintiffs' systems and services.

### D. Defendant's Products

37. Lippany's products consisted of the following five software programs: (a) a procedure-level engineered standard-based cost system known as MICROCOST; (b) a hospital-wide all department staffing control system known as ACCUSTAFF; (c) an operating room data gathering system to track utilization, known as INFOSURG; (d) a system to optimize the application of surgical block times by surgeon, known as OPTISURG; and (e) an acuity-based nurse staffing system, known as ACCUNURSE.

38. Defendant began work on the development of his ACCUSTAFF program in March of 1984. ACCUSTAFF was completed in July of 1985.

39. Defendant began work on the development of his ACCUNURSE program in March of 1985. ACCUNURSE was completed in December of 1985.

40. Defendant began work on the development of his OPTISURG program in Sep-

tember of 1985. OPTISURG was completed in March of 1986.

41. Defendant began work on the development of his MICROCOST program in March of 1986. MICROCOST was completed in December of 1986.

42. Defendant began work on the development of his INFOSURG program in June of 1986. INFOSURG was completed in May of 1987.

43. Defendant developed his five software programs during his employment with plaintiffs.

44. On January 19, 1988, Lippany, at his request, met with Donald Bishop, executive vice president of HAS. At the meeting, Lippany presented to Bishop his five software programs, including marketing brochures, documentation, and a product description and marketing plan for Lippany's company, HMI.

*E. Comparison of Plaintiffs' Systems and Defendant's Products*

45. HAS developed its SCAS over the period 1981 to 1983–84. The main frame software was programmed and became operational in 1986.

46. Lippany's competing product is called MICROCOST and runs on a personal computer.

47. Both HAS's SCAS and Lippany's MICROCOST serve the same purpose; they are both procedure-level engineered standard-based cost accounting systems, which assist hospitals in price setting and in contractual bidding for services offered.

48. There are a number of cost accounting systems available in the marketplace from a variety of vendors. Each cost accounting system has a certain methodology which it follows to perform its functions.

49. The methodology of HAS's SCAS includes at least 15 functional specifications, some of which must be addressed in a certain sequence within the system. Different cost accounting systems can elect among at least three alternative methods or factors as to each of these 15 items in determining the particular functions which the system will perform.

50. While some cost accounting systems have some features in common, only HAS's SCAS and Lippany's MICROCOST follow the same methodology.

51. Lippany derived MICROCOST from HAS's SCAS, using the confidential information and methodologies he had access to while in plaintiffs' employ.

52. OMIS was developed in the mid to late 1970s. The software originally was processed on a main frame computer. By late 1986, OMIS had been reprogrammed to run on a personal computer and was renamed OMIS II. While there were enhancements made to OMIS II, it employs the same methodology as the original OMIS.

53. Lippany's competing product is called ACCUSTAFF and runs on a personal computer.

54. Both OMIS/OMIS II and Lippany's ACCUSTAFF serve the same purpose; they are both hospital-wide, all-department staffing control systems. The productivity information generated by OMIS/OMIS II and ACCUSTAFF may be used by hospitals to assist in their staffing, scheduling and budgeting processes.

55. There are numerous productivity systems available in the marketplace from a variety of vendors. Each productivity system has a certain methodology which it follows to perform its functions.

56. The methodology of HAS's OMIS includes 15 functional specifications, some of which must be addressed in a certain sequence within the system. Different productivity systems can elect among at least three alternative methods or factors as to each of these 15 items in determining the particular functions the system will perform.

57. While some productivity systems have some features in common, only HAS's OMIS and Lippany's ACCUSTAFF follow the same methodology.

58. Lippany derived ACCUSTAFF from HAS's OMIS system, using the confidential information and methodologies to which he had access while in plaintiffs' employ.

59. HAS developed its SBSS during the late 1970s to about 1980. HAS's SBSS is a non-computerized system which optimizes the allocation of surgical block times in the operating room, through the use of particular formulas in a particular sequence.

60. Lippany's competing product is called OPTISURG, is an automated version of HAS's SBSS, and is designed to run on a personal computer.

61. HAS's SBSS and OPTISURG serve the same purpose; they both optimize the allocation of surgical block time for more efficient utilization of the hospital's operating rooms.

62. Other than OPTISURG, there is no other surgical block scheduling system available in the marketplace that follows the same formulas and sequence of formulas as HAS's SBSS.

63. Lippany derived OPTISURG from HAS's SBSS, using the confidential information and methodologies to which he had access during his employment with plaintiffs.

64. HAS developed its CORDA system in the early to mid 1970s. It was enhanced through reprogramming in the early 1980s in a data base language so the system could be more flexibly designed and generate additional reports.

65. Lippany's competing product is called INFOSURG and runs on a personal computer.

66. Both HAS's CORDA system and Lippany's INFOSURG serve the same purpose; they both gather hospital operating room historical surgical activity to develop surgical block schedules. Hospitals may use both CORDA and INFOSURG as a tool to develop optimal surgical block schedules.

67. CORDA and INFOSURG are both prerequisites to the development and optimization of surgical block allocations by surgeon or by surgeon groups.

68. The type of information together with the manner in which it is organized in the CORDA system constitutes the system's methodology.

69. There are other products available in the marketplace for gathering historical operating room data, but none, other than INFOSURG, use the same methodology that HAS's CORDA system does.

70. Lippany derived INFOSURG from HAS's CORDA system, using the confidential information and methodologies to which he had access during his employment with plaintiffs.

71. HAS developed its semi-automated SLS in the early 1970s. The software is processed on a main frame computer.

72. Lippany's competing product is called ACCUNURSE and runs on a personal computer.

73. Both HAS's SLS and Lippany's ACCUNURSE serve the same purpose; they are both acuity-based nurse staffing systems. Hospitals may use both systems to determine what the required staffing needs should be on each hospital unit, based on the amount of care required by the patients in that unit. In addition, the systems may be used for budgeting and performance monitoring.

74. There are numerous acuity-based nurse staffing systems available to hospitals in the marketplace from a variety of vendors. Many of the methods and formulas of HAS's SLS are unique to it in that no other nurse staffing system, other than ACCUNURSE, uses the same methods and formulas. The structure of plaintiffs' SLS and defendant's ACCUNURSE are identical.

75. Lippany has derived ACCUNURSE from HAS's SLS, using the confidential information and methodologies to which he had access while in plaintiffs' employ.

76. Lippany's products in large part comprise the systems that he was directed to develop for plaintiffs as part of the enhancement of plaintiffs' existing systems.

*F. Defendant's Competition with Plaintiffs*

77. Commencing at least as early as 1983, while in plaintiffs' employment, Lippany undertook steps to establish and conduct a business to compete with plaintiffs

and, specifically, to design, develop, market, sell and install products derived from, substantially similar to and competitive with plaintiffs' systems for plaintiffs' existing and potential clients.

78. Lippany is offering, marketing and/or selling his products and/or using said products to do work for at least one of plaintiffs' former clients, Altoona Hospital, and has solicited business from Carlisle Hospital as well.

79. At the January 19, 1988 meeting, Lippany informed Bishop that he already had proposed a joint business venture to a competitor of HAS, known as M–Dax. Lippany proposed a similar business relationship to Bishop.

80. Lippany's products have been developed from and are based on plaintiffs' confidential information and trade secrets, to which Lippany had access and of which he had knowledge while in plaintiffs' employment.

81. Lippany has refused to turn over to plaintiffs the five software products he is marketing.

82. Lippany has retained and is using confidential information and trade secrets of plaintiffs to engage in competition with plaintiffs.

### G. Harm to Plaintiffs, Defendant and Third Parties

83. Altoona Hospital will suffer some inconvenience if Lippany is enjoined from engaging in the consulting services he has agreed to perform for the hospital; this inconvenience will be limited to personnel difficulties associated with the transition from one management consultant to another.

84. Lippany will suffer financial harm if he is enjoined from engaging in management consulting services and/or marketing his software systems in that he will be deprived of a source of income.

85. Plaintiffs will suffer irreparable harm if Lippany is not enjoined from providing hospital management consulting services and marketing the software programs which are based upon and derived from confidential information and trade secrets of plaintiffs.

### MEMORANDUM OPINION AND CONCLUSIONS OF LAW

This Court has jurisdiction over the copyright claims at issue in this action pursuant to 28 U.S.C. § 1338, and may exercise jurisdiction over the state law claims pursuant to the doctrine pendent jurisdiction. *Carnegie Mellon University v. Cohill,* —— U.S. ——, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

In order to be entitled to a grant of a preliminary injunction, the moving party must show a likelihood of success on the merits of the litigation and irreparable harm. *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 151 (3d Cir.1984). In addition to these two requirements, the district court "should take into account, when they are relevant, ... the possibility of harm to other interested persons from the grant or denial of the injunction, and ... the public interest." *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982). Each of these elements will be addressed in turn.

### I. Likelihood of success on the merits

Plaintiffs' complaint sets forth claims of copyright infringement and misappropriation of trade secrets and confidential information. In addition, plaintiffs seek recovery on the theories of fraudulent misrepresentation, breach of an employment contract, unfair competition, tortious interference with contractual and business relations, and diversion of corporate opportunities. The Court's factual findings on the issues presented in the context of the motion for a preliminary injunction will not be binding in the final outcome of this matter; the defendant has demanded a jury trial and the jury eventually will be making the final determination on the merits. Therefore, the Court finds it necessary to address only plaintiffs' claims regarding copyright infringement and misappropriation of trade secrets and confidential information. Plaintiffs have demonstrated substantial likelihood of success on the merits of their trade secret and confidential infor-

mation claims; this finding permits the Court to grant plaintiffs the relief they are seeking. Although plaintiffs have failed to demonstrate a likelihood of success on the merits with respect to their copyright claim, the Court addresses this issue because the legal rulings contained herein will be determinative of the scope of the matters which may be presented at later stages of this case.

### A. Copyright claims

■ Plaintiffs contend that the defendant has infringed plaintiffs' copyrights in their software programs. Under the Copyright Act, 17 U.S.C. § 411, no action for copyright infringement may be brought until the copyright claim has been registered in accordance with the provisions of the copyright laws. Plaintiffs have submitted evidence of registration of their SCAS program, the second generation of their OMIS program, known as OMIS II, their CORDA program and their SLS program. Therefore, it is these four programs which are at issue in the copyright infringement aspect of this suit.[1]

In order to make out a claim of copyright infringement, the plaintiffs must demonstrate ownership of a valid copyright and copying by the alleged infringer. *Whelan Associates v. Jaslow Dental Laboratory*, 797 F.2d 1222 (3d Cir.1986). As noted above, plaintiffs have provided evidence that they are the owners of valid copyrights in the four programs at issue. Thus, the primary issue is whether defendant has copied these programs.

Copying, of course, may be demonstrated by direct evidence. In the absence of such documentation, however, a plaintiff may show copying inferentially by demonstrating that the defendant had access to the allegedly infringed copyrighted work and that the allegedly infringing work is sub-

stantially similar to the copyrighted work. *Whelan, supra,* at 1232; *Universal Athletic Sales Co. v. Salkeld,* 511 F.2d 904, 907 (3d Cir.), *cert. denied,* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975). While in the plaintiffs' employ, defendant clearly had extensive access to plaintiffs' systems and to the methodologies used to develop plaintiffs' software programs. The central issue presented in the instant case is whether defendant's programs are "substantially similar" to those developed by plaintiffs.

The copyright laws are designed to protect expression, and not ideas. *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879). This policy attempts to strike a balance between the dissemination of information for the promotion of learning, culture and development, and the protection of innovative works, thus creating an incentive for development. *Whelan, supra,* at 1235; *Apple Computer, Inc. v. Franklin Computer Corporation,* 714 F.2d 1240, 1253 (3d Cir.1983).

The Third Circuit has attempted to formulate the line between expression and idea in the context of computer programs in two recent cases. In *Apple Computer, supra,* the Court held that the source and object codes of a computer program constitute expression and are entitled to copyright protection.[2] In *Whelan,* this protection was extended to a so-called "non-literal" aspects of the program, i.e., its structure, sequence and organization. The Court there noted that the line between expression and idea may be determined by reference to the purpose the work is designed to serve; where the work is of a utilitarian nature, the purpose or function of the work constitutes its idea while everything that is not necessary to the purpose or function is part of the expression of the

---

1. Registration of the copyright is required even if the only relief sought in the action is injunctive in nature. *New York Times Co. v. Star Co.,* 195 F. 110 (S.D.N.Y.1912); Nimmer on Copyrights, § 7.16[B][1]. Although the copyright registration of these four programs did not occur until 1988, once registration has taken place, a suit may be brought for allegedly infringing actions which occurred before the date

of registration, provided the statute of limitations has not expired. *International Trade Management, Inc. v. United States,* 553 F.Supp. 402 (Cl.Ct.1982); Nimmer on Copyright § 7.16[B][1].

2. *See Whelan,* at 1230–31, for descriptions of source and object codes.

idea. *Whelan,* at 1236. The Court went on to explain the "expression of the idea in a software computer program is the manner in which the program operates, controls and regulates the computer in receiving, assembling, calculating, retaining, correlating, and producing useful information either on a screen, printout or by audio communication." *Id.* at 1239.

In *Whelan,* evidence had been presented documenting that other programs on the market performed the same functions but had different structures and designs. It was on this basis that the Court concluded that the structure, sequence and organization of the program were non-essential to its purpose and, therefore, constituted expression. Plaintiffs in the instant case, as in *Whelan,* have presented evidence documenting that there exist other programs in the marketplace which perform the same functions, services and purposes as do plaintiffs' programs. Plaintiffs also have documented that these programs do not employ the same methodologies as do the programs developed by plaintiffs (and defendant's comparable programs).

Plaintiffs argue that the methodologies which they have used to develop their software programs are entitled to copyright protection. The critical determination is whether these methodologies constitute "expression" and hence are entitled to copyright protection, or whether, despite the fact that they have been characterized by plaintiffs as the programs' structure, sequence and organization, they are more akin to "idea," which must remain in the public domain. The issue will turn on the connotations associated with the terms "structure, sequence and organization." [3] It is essential to realize that the phrase was used by the Court in *Whelan* to define the scope of protection to be afforded a computer program. Thus, the starting point for analysis must be the definition of computer program set forth in the Act itself.

Title 17 U.S.C. § 101 provides that "a 'computer program' is set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." The *Whelan* decision provides a gloss upon this definition; as the Court there noted, "the 'expression of the idea' in a software computer program is the manner in which the program operates, controls and regulates the computer in receiving, assembling, calculating, retaining, correlating, and producing useful information...." *Id.* at 1239.

The *Whelan* Court determined that programs other than the plaintiff's served the same purposes but employed different means to that end; thus, the means achieved to serve the underlying purposes were non-essential to those purposes and constituted protected "expression." In reaching this result, the Court, compared the organization of the modules and subroutines of the plaintiff's and defendant's programs. For example, the Court noted that the plaintiff's system performed certain functions, relating to printing of reports and sales analyses, in a certain order. In contrast, the defendant's program simply reversed this order. Other than this single aspect, the two software systems performed the same steps in the same sequence.

In the case at hand, virtually no evidence was presented concerning the structure, sequence and organization of the programs' modules, subroutines or the like.[4] The evidence merely documents that certain choices were made among factors at a gross level, e.g., the scope of the system, the number of variables to be used or the portions of the workforce to be included in

---

**3.** The Third Circuit in *Whelan* used the words interchangeably and considered them to be synonymous. 797 F.2d at 1224, n. 1.

**4.** Plaintiffs evidence on this point was limited to the testimony of Aldo Zini, HAS's Vice President for consulting services, who stated that he had compared approximately the first fifty lines of the OMIS II and ACCUSTAFF programs and had noted three similarities: (1) the nature of the dimension statements, which determine the amount of memory to be allocated to a given variable and the way in which the amount is defined; (2) the placement of "GO TO" statements; and (3) the location of the main menu. Zini, however, emphasized that he had not done an in-depth line-by-line comparison of the two programs' structures.

calculation of labor hours. The result of these choices, however, do not constitute the programs' structure, sequence and organization within the meaning of *Whelan.*

In support of their copyright infringement claims, plaintiffs introduced evidence, as to each of the four programs at issue, documenting choices made among alternative factors in the development of the programs. As an example, in connection with plaintiffs' OMIS system, evidence was introduced documenting that the system is "engineered standards-based." By way of comparison, other systems performing the same function as the OMIS system might be hospital comparison-based. Similarly, the OMIS system uses multivariable sets; other systems might use a single variable or unlimited variables.

As another example, plaintiffs' SCAS is a procedure-based cost accounting system. Other systems which perform the same functions may determine costs by department, by patient or by product-line. SCAS includes labor, supplies, equipment and overhead in its cost accounting; other systems which perform the same functions may use only some of these categories or may use several categories other than those employed by plaintiffs.

The evidence is undisputed that choices made among these alternative factors in the development of a program will affect the ultimate structure of the program. Plaintiffs have demonstrated that, in the development of the programs, elections were made among various alternatives which, when taken as a whole, would dictate the functional specifications of the programs. No evidence, however, was presented to indicate how the choices among these alternatives, i.e., the methodologies, would translate into "a set of statements or instructions" which could be used in a computer, either directly or indirectly, to bring about a certain result. *See* 17 U.S.C. § 101, *supra.* Likewise, there was no evidence demonstrating how the methodologies at issue would operate, control or regulate the receipt, assembly, calculation, retention, correlation and production of information. *Whelan,* at 1239. In short, plaintiffs have not met their burden of demonstrating that the methodologies of their systems comprise the "structure, sequence and organization" of a computer program within the meaning of the copyright law and the *Whelan* decision. Accordingly, the Court concludes that plaintiffs have failed to establish a likelihood of success on the merits of their copyright claims.

**B.  Breach of employment agreement and disclosure of trade secrets**

**1.  The Employment Agreement: Confidential Information**

■ On June 1, 1987, defendant and HAS entered into an employment agreement; this employment agreement was executed in connection with defendant's promotion and an associated increase in salary. Under Pennsylvania law, the duty of an employee not to disclose the secrets of his employer may arise either from an express contract, as it does in the instant case, or may be implied from the confidential relationship existing between the master and servant. *MacBeth–Evans Glass Co. v. Schnelbach,* 239 Pa. 76, 86 A. 688 (1913). *See also Air Products and Chemicals, Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114 (1982). It is apparent that a confidential relationship existed between defendant and HAS. Where such a confidential relationship exists, injunctive relief will be granted to protect against the disclosure of information held secret by the employer, of which the employee gained knowledge as the result of his former employment situation. *Air Products and Chemicals, Inc., supra,* 442 A.2d at 1120; *Computer Print Systems, Inc. v. Lewis,* 281 Pa.Super. 240, 422 A.2d 148 (1980).

The evidence presented during the hearing in this matter would strongly support the finding that the defendant has used the knowledge he acquired during his employment in the development of his five software programs, specifically his knowledge regarding existing software and software under development at HAS and customer needs and requirements. Defendant has admitted that he turned over detailed meth-

odology to the programmers he employed to develop the software for his five programs; the evidence establishes that these methodologies were developed by plaintiffs' employees during their employment with plaintiffs.

Although defendant did demonstrate that plaintiffs had, on a limited number of occasions, given presentations concerning their hospital management systems in general, no evidence was presented that the methodologies of these systems ever were revealed to even a limited segment of the general public. Therefore, the methodologies constitute confidential information within the meaning of defendant's employment agreement.

The use of such confidential information would constitute a breach of the employment agreement. The evidence presented would support a finding that such a breach began prior to the termination of defendant's employment with plaintiffs and that it is of an ongoing nature; defendant derived the software systems he is marketing from plaintiffs' methodologies and has been utilizing plaintiffs' confidential information in his ongoing consulting arrangement with Altoona Hospital.

### 2. The Employment Agreement: Products Developed During Defendant's Employment

■ In addition to the provision concerning the preservation of confidential information, defendant's employment agreement states that all "products, processes, methodologies and services, including but not limited to systems and software developments and improvements ... developed by [defendant] alone, or in conjunction with any other person or persons during his employment with HAS which in any way relate to the future business of HAS shall be the sole and exclusive property of HAS." Defendant does not dispute that he developed his five software programs during the period of time that he was employed by HAS, i.e., between 1984 and 1987. Defendant argues, however, that he performed the work associated with the programs' development at home, and not during the hours for which he was being paid by HAS.

While the evidence submitted on this point was not substantial, that which was introduced tends to contradict defendant's assertions that all of the development of the five programs was done on defendant's own time. This fact is not dispositive of the issue, in any case. It is abundantly clear that the five software programs which defendant has developed are products which defendant was assigned the task of developing as part of his normal job duties as a consultant with HAS. Defendant failed to develop the programs as assigned; rather, utilizing the methodologies, confidential information and trade secrets of plaintiffs (*see infra*), he developed five products which fulfilled the customer needs which plaintiffs' had foreseen and were attempting to serve. Defendant agreed that any software which he developed during his employment which "in any way relate[d] to the present or future business of HAS" belongs to HAS. Consequently, plaintiffs have made a substantial showing of likelihood of success on the merits of their claim that the five software programs developed by defendant in fact are the property of HAS, and that defendant has no right to the use of the same.

### 3. Trade Secrets

■ Under the law of Pennsylvania, in order to be entitled to injunctive relief against an employee for misappropriation of trade secrets, the employer bears the burden of demonstrating the following factors: (1) that there is a trade secret or secret process of manufacture; (2) that it is of value to the employer and important in the conduct of its business; (3) that by reason of discovery or ownership the employer has the right to use an enjoyment of the secret; and (4) that the secret was communicated to the employee while he was employed in a position of trust and confidence, under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer. *Felmlee v. Lockett*, 466 Pa. 1, 8, 351 A.2d 273, 277 (1976); *Air Products and Chemi-*

*cals, Inc. v. Johnson,* 296 Pa.Super. 405, 442 A.2d 1114 (1982).

Section 757, comment B, of the Restatement of Torts, § 757, comment B, which has been adopted as the law of Pennsylvania, is determinative of the existence of a trade secret. *See, e.g., Felmlee v. Lockett, supra; Air Products and Chemicals, Inc., supra.* Section 757, comment B, provides as follows:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competition who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.... A trade secret is a process or device for continuous use in the operation of the business.

Trade secrets, in order to be entitled to protection, must be "particular secrets of the complaining employer and not general secrets of the trade in which he is engaged." *Capital Bakers v. Townsend,* 426 Pa. 188, 231 A.2d 292 (1967). Computer software programs are a proper subject of trade secret protection. *Computer Print Systems, Inc. v. Lewis,* 281 Pa.Super. 240, 422 A.2d 148 (1980).

In determining whether given information constitutes a trade secret, this Court is required to examine the following factors: the extent to which the information is known outside of the owner's business; the extent to which it is known by employees and other involved in the owner's business; the extent of measures taken by the owner to guard the secrecy of the information; the value of the information to the owner and to his competitors; the amount of effort or money expended by the owner in developing the information; and the ease or difficulty with which the information could be properly acquired or duplicated by

others. *S.I. Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1256 (3d Cir.1985).

As the foregoing factual findings establish, plaintiffs have presented substantial evidence going to each of the aforesaid six factors. Plaintiffs' methodologies have been developed by plaintiffs through the expenditure of considerable employee time and financial resources. These methodologies could be developed by others only via an equivalent expenditure of time and money. Plaintiffs have been careful to guard against the unauthorized disclosure of their methodologies to persons outside Blue Cross and HAS and have not revealed the methodologies to the general public. Access to the methodologies within plaintiffs' business structure has been on a limited, need-to-know basis. Maintenance of the confidentiality of the methodologies is essential to the future conduct of plaintiffs' hospital management consulting business. Therefore, the methodologies constitute trade secrets within the meaning of § 757.

Plaintiffs also must establish that the trade secret is of value to them and important in the conduct of their business. As stated above, and set forth in the factual findings, plaintiffs' status in the hospital management consulting field depends in large measure upon their continued exclusive use of their methodologies; therefore, this element is satisfied.

Plaintiffs likewise must establish that, by reason of discovery or ownership thereof, they have the right to use and enjoyment of the trade secret. The testimony establishes that plaintiffs' employees developed the methodologies during their employment with plaintiffs. Therefore, plaintiffs have the right to use the enjoyment of the same.[5]

The final element which the plaintiffs must establish is that the trade secret was communicated to the employee while he was employed in a position of trust and confidence, under such circumstances as to make it inequitable and unjust for him to disclose it to others or to make use of it

---

**5.** With respect to plaintiffs' SBSS, which was developed by defendant Lippany, *see* discussion, *infra.*

himself. Under the law of Pennsylvania, a confidential relationship between employer and employee is created where the employer turns over to the employee a pre-existing trade secret. "A pledge of secrecy is impliedly extracted from the employee, a pledge which he carries with him even beyond the ties of his employment relationship." *Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960). During his employment with plaintiffs, defendant had access to the methodologies at issue herein for the express purpose of developing and enhancing the same. Defendant, rather than developing plaintiffs' programs, as he had been directed to do, used plaintiffs' existing methodologies to develop five software programs which he intended to put to his own personal use. It would be inequitable for defendant to utilize these trade secrets for his own benefit.

In summary, plaintiffs have sustained their burden of demonstrating a substantial likelihood of success on the merits of their trade secret claim and, accordingly, are entitled to injunctive relief.

### C. Scope of Appropriate Relief

■ Defendant makes two arguments directed to the scope of injunctive relief which might be granted in this action. First, he contends that he cannot be enjoined from using the knowledge he acquired during the years employed by plaintiffs. In *S.I. Handling Systems, Inc., supra,* the Third Circuit observed that:

> The concept of a trade secret does not include a man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment.... The right to use and expand these powers remains his property. 753 F.2d at 1256 (*citing Pittsburgh Cut Wire Co. v. Sufrin*, 350 Pa. 31, 35, 38 A.2d 33, 34 (1944)).

While this may be the law of Pennsylvania, the Court concludes that defendant has waived any right to unrestricted use of the "subjective knowledge" that he acquired during the course of his employment with plaintiffs; to the extent such knowledge is

of "customer needs and requirements, ... existing software and software under development, marketing plans, pricing information, employee lists, salaries and benefits, ... and information relating to the business and affairs of persons and entities with whom HAS has business relations which is not generally available to the public," it constitutes confidential information within the purview of the employment agreement; therefore, by virtue of his agreement to the terms thereof, defendant is restricted from making any use of such confidential information, on his own behalf or on behalf of any other person or entity. *See,* e.g., *Ogontz Controls Co. v. Pirkle*, 346 Pa.Super. 253, 499 A.2d 593 (1985).

■ Secondly, defendant argues, since he developed the SBSS system himself, without substantial input and effort by other employees of plaintiffs, no "implied pledge of secrecy" can be said to arise. Defendant cites the case of *Wexler v. Greenberg, supra,* wherein the Pennsylvania court held that where an employee turns over to his employer a trade secret which he, the employee, has developed, no implied agreement to maintain the trade secret confidential exists. 160 A.2d at 434.

The facts of *Wexler* are clearly distinguishable from the instant case. Defendant herein has entered into an agreement with plaintiffs under the terms of which he agreed (1) that any products, processes and methodologies developed by him during his employment with HAS is the property of HAS, and (2) to preserve the confidentiality of plaintiffs' methodologies, which would include that of the SBSS system. As the Pennsylvania Superior Court noted in *Ogontz Controls Company, supra,* the defendant's presence in the market as a seller of the product allegedly developed while he was employed by plaintiff "is precisely the harm sought to be avoided by [plaintiff] when both defendant and the company entered into the employment contract." 499 A.2d at 597. This statement applies with equal force in the case at hand. Plaintiffs employed defendant for the express purpose of having him develop and enhance the hospital management systems at issue in this action. Defendant agreed that his

efforts to that end would inure to plaintiffs' benefit. Equity will not permit him to appropriate plaintiffs' systems, methodologies and programs for his own personal benefit.

### II. Harm to Plaintiffs, Defendant and Third Parties

Defendant's actions threaten irreparable harm to plaintiffs. As discussed above, the revelation of their confidential information and trade secrets to the general public would have a serious detrimental effect upon plaintiffs' standing in the hospital management consulting field. Plaintiffs are acknowledged as a leader in this field, based largely upon the fact that they offer a unique range of consulting services and associated software.

The harm to plaintiffs easily outweighs the harm to third parties, such as Altoona Hospital, which will suffer a temporary inconvenience during the transition to a new management consultant. The harm which will be sustained by defendant as a consequence of the grant of injunctive relief is afforded comparatively little weight in the balancing of harms which this Court is required to undertake, given the strong showing plaintiffs have made in this action.

### III. Conclusion

In summary, the Court finds that plaintiffs have made a substantial showing that defendant has misappropriated plaintiffs' confidential information and trade secrets and has used the same to develop his five software programs which he has used to his own benefit. Defendant has the capability to continue to use these programs. Such continued use would result in serious irreparable injury to plaintiffs' competitive status in the hospital management consulting field.

An appropriate Order will be issued.

### ORDER

AND NOW, this 11th day of August, 1988, after hearing on Plaintiffs' Motion for a Preliminary Injunction and in accordance with this Court's Findings of Fact, Memorandum Opinion and Conclusions of Law filed herewith,

IT IS HEREBY ORDERED that said Motion is GRANTED and that defendant Lippany is hereby ENJOINED from:

1. making any use of the confidential information of plaintiffs either on his own behalf or in behalf of or in conjunction with any other person or entity. Confidential information includes all information that concerns the business or affairs of HAS which is not generally available to the public at large, including, but not limited to, customer lists, customer needs and requirements, knowledge relating to plaintiffs' existing software and software under development, marketing plans, pricing information, employee lists, employee salaries and benefits, information relating to the business and affairs of persons and entities with whom HAS has business relations which is not generally available to the public at large which has come to defendant's attention in the course of his employment by HAS;

2. making use in any form whatsoever of plaintiffs' trade secrets including specifically the five hospital management systems at issue in the above captioned action and their associated methodologies;

3. making, using, selling, displaying, distributing, offering for sale, advertising, copying or reproducing the ACCUSTAFF, ACCUNURSE, OPTISURG, INFOSURG and MICROCOST software programs; and

4. providing consulting services to Altoona Hospital to the extent that the provision of such services requires that defendant Lippany employ confidential information or trade secrets of plaintiffs.

The provisions of this Order likewise shall apply to defendant Lippany, doing business as Hospital Microsystems, Inc.