**TRANDES CORPORATION,**
Plaintiff–Appellee,

v.

**GUY F. ATKINSON COMPANY,**
Defendant–Appellant,

and

**Washington Metropolitan Area Transit Authority, Defendant.**

No. 92–2182.

United States Court of Appeals,
Fourth Circuit.

Argued March 4, 1993.

Decided June 10, 1993.

Christian D. Abel, Murray, Jacobs & Abel, Alexandria, VA, (Richard Murray, Murray, Jacobs & Abel, Alexandria, VA, Tobey B. Marzouk, Thomas M. Parry, Washington, DC, on brief) for appellee.

Before WILLIAMS, Circuit Judge, SPROUSE, Senior Circuit Judge, and VOORHEES, Chief United States District Judge for the Western District of North Carolina, sitting by designation.

## OPINION

WILLIAMS, Circuit Judge:

The Trandes Corporation brought this diversity suit against the Guy F. Atkinson Company (Atkinson) and the Washington Metropolitan Area Transit Authority (WMATA). Trandes alleged that WMATA improperly disclosed and Atkinson improperly acquired and used the "Tunnel System." The Tunnel System is a computer program written by Trandes's president, James Brusse, to perform survey calculations for the construction of subway tunnels. After a three day trial, the district court submitted five issues to the jury: (1) whether WMATA breached its contract with Trandes, (2) whether WMATA breached its fiduciary duties to Trandes, (3) whether WMATA misappropriated Trandes's trade secrets, (4) whether Atkinson misappropriated Trandes's trade secrets, and (5) whether Atkinson's actions had been willful, wanton, and malicious. The jury found for Trandes on each claim and awarded $17,400 in compensatory damages.[1] The jury also found that Atkinson's actions had been willful, wanton, and malicious and accordingly awarded Trandes $750,000 in punitive damages.

After the jury returned its verdict in favor of Trandes, Atkinson moved for judgment as a matter of law. Atkinson also moved for a remittitur of punitive damages on the ground that any act of misappropriation occurred after the effective date of the Maryland Uniform Trade Secrets Act (MUTSA), Md.Com. .

John G. DeGooyer, Hopkins & Sutter, Washington, DC (Ronald A. Uitz, on brief), for appellant.

---

1. Trandes also asserted causes of action for copyright infringement and intentional interference with contractual relations against Atkinson. The district court did not submit either of these claims to the jury. Trandes has not appealed from that decision. Also, WMATA has not appealed its adverse verdict.

Law II Code Ann. §§ 11–1201 to –1209 (Michie 1990), and was therefore subject to the statutory cap that limits punitive damages to twice compensatory damages, *id.* § 11–1203(d). The district court denied both motions. *Trandes Corp. v. Guy F. Atkinson Co.*, 798 F.Supp. 284, 288–90 (D.Md.1992).

Atkinson now appeals from the district court's decisions, arguing that (1) Trandes's claim of trade secret misappropriation is preempted by § 301(a) of the Copyright Act, 17 U.S.C. § 301(a) (1988); (2) Trandes failed to prove that it possessed any trade secrets; (3) Trandes failed to prove that Atkinson ever acquired any of the alleged trade secrets; and (4) Trandes failed to prove that Atkinson's acquisition of the Tunnel System was improper. We reject these arguments and hold that the district court properly denied Atkinson's motion for judgment as a matter of law. We therefore affirm Atkinson's liability for trade secret misappropriation. Atkinson correctly argues, however, that the evidence does not support the district court's conclusion that Atkinson misappropriated Trandes's trade secrets before the effective date of the MUTSA. We therefore reverse the district court's denial of Atkinson's motion for a remittitur and remand for an assessment of punitive damages in accordance with § 11–1203(d) of the MUTSA.

## I.

Atkinson first argues that § 301(a) of the Copyright Act preempts Trandes's claim for trade secret misappropriation. This argument raises a question of law, which we review de novo. *Taylor v. Local No. 7, Int'l Union of Journeymen Horseshoers*, 353 F.2d 593, 601 (4th Cir.1965), *cert. denied,* 384 U.S. 969, 86 S.Ct. 1859, 16 L.Ed.2d 681 (1966).

■■ The district court did not explicitly rule on Atkinson's preemption argument, but instead held that the Copyright Act did not govern this case because Trandes did not timely register the Tunnel System for copyright protection. *Trandes Corp.,* 798

F.Supp. at 286 n. 1. In reaching this conclusion, the district court relied on § 411 of the Copyright Act, which provides that "no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a) (Supp. II 1990).

Although § 411(a) relates to the validity of Trandes's copyright infringement claim, it has no bearing on the preemption of state law under § 301. Section § 411(a) merely requires a copyright owner to register its copyright before filing an action for copyright infringement. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 492 n. 44, 104 S.Ct. 774, 815 n. 44, 78 L.Ed.2d 574 (1984). As nothing more than a jurisdictional prerequisite, § 411(a) does not affect the broad preemptive scope of § 301. Trandes cannot escape the preemptive effect of § 301 merely by failing to register its copyright in a timely fashion. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 775 F.Supp. 544, 565 (E.D.N.Y.1991) (failure to comply with requirements for copyright protection does not negate federal preemption), *aff'd in part, vacated in part, and remanded,* 982 F.2d 693 (2d Cir.1992). Consequently, the district court erred in relying on § 411(a). For the reasons set forth below, however, we agree with the district court's conclusion that the Copyright Act does not preempt Trandes's trade secret claims.

Section 301(a) of the Copyright Act provides that

all legal or equitable *rights that are equivalent to any of the exclusive rights within the general scope of copyright* . . . in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright . . . *are governed exclusively by this title.* . . . [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a) (emphasis added); *but see* 17 U.S.C. § 301(b) (1988 & Supp. II 1990).[2]

---

**2.** Section 301(b) provides:

Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to (1) subject matter that

does not come within the subject matter of copyright as specified by sections 102 and 103 . . . or (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive

Trandes's claim for trade secret misappropriation seeks to protect rights in its computer program, which clearly comes within the "subject matter" of copyright. 17 U.S.C. § 102(a) (1988 & Supp. II 1990) (the subject matter of copyright is "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device"); *see also M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 434–35 (4th Cir.1986) (computer programs are copyrightable); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1249 (3d Cir.1983) ("a computer program, whether in object code or source code, is a 'literary work' and is protected from unauthorized copying, whether from its object or source code version"), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 2.06A[5][c], at 2–168 to 2–171 (1993). Thus, if the rights Trandes seeks to protect are "equivalent" to the exclusive rights reserved to the owner of a copyright, Trandes's cause of action for misappropriation of trade secrets is preempted.

The owner of a copyright has the exclusive right to (1) reproduce the work, (2) prepare derivative works based on the work, (3) distribute copies of the work, (4) perform the work publicly, and (5) display the work publicly. 17 U.S.C. § 106 (1988 & Supp. II 1990). Trandes predicated its unsuccessful claim for copyright infringement on Atkinson's unauthorized acquisition and use of its computer software. Because Trandes based its claim for misappropriation of trade secrets on the same conduct, Atkinson contends that the latter cause of action is preempted. To support its claim, Atkinson relies on the holdings of *Relational Design & Technology, Inc. v. Data Team Corp.,* 23 U.S.P.Q.2d (BNA) 1074, 1992 WL 97799 (D.Kan.1992); *Computer Associates,* 775 F.Supp. 544; and *Videotronics, Inc. v. Bend Electronics,* 564 F.Supp. 1471 (D.Nev.1983),

*later proceeding,* 586 F.Supp. 478 (D.Nev. 1984).

 Atkinson takes the wrong approach by focusing its preemption analysis on the conduct alleged to support the two causes of action. To determine whether a particular cause of action involves rights equivalent to those set forth in § 106, the elements of the causes of action should be compared, not the facts pled to prove them. As the Second Circuit held in *Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 200 (2d Cir.1983), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), "when a state law violation is predicated upon an act *incorporating elements beyond mere reproduction or the like,* the rights involved are not equivalent and preemption will not occur." (Emphasis added.) *See also Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 716 (2d Cir.1992) (following *Harper & Row* test); *but see Relational Design,* 23 U.S.P.Q.2d at 1076 (where defendants allegedly reproduced and/or sold copies of plaintiff's software programs without authorization, the facts alleged to support the misappropriation and copyright infringement claims were identical and the trade secret action was preempted); *Computer Assocs.,* 775 F.Supp. at 564 (where plaintiff's complaint stated that the act of copying the various elements of its computer program constituted both infringement of copyright and misappropriation of trade secrets, the trade secret claim was preempted).[3] To avoid preemption, a cause of action defined by state law must incorporate elements beyond those necessary to prove copyright infringement, and must regulate conduct qualitatively different from the conduct governed by federal copyright law. *Harper & Row,* 723 F.2d at 200–01; 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.01[B][1] at 1–14 (1992). This test has become known as the "extra element" test. *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 795 F.Supp. 501, 505 (D.Mass.1992), *later proceeding,* 803 F.Supp. 487 (D.Mass. 1992). Therefore, we must examine and

---

rights within the general scope of copyright as specified by section 106.

**3.** Although *Videotronics* does discuss preemption, it does not mention § 301 and ignores the specific requirements of that section.

compare the constituent elements of a claim for copyright infringement and a claim for trade secret misappropriation.

To prove copyright infringement, a plaintiff must show (1) that it owned a valid copyright and (2) that the defendant copied original elements of its copyrighted work. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, ——, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). To prove misappropriation of a trade secret, on the other hand, a plaintiff must show (1) that it possessed a valid trade secret, (2) that the defendant acquired its trade secret, and (3) that the defendant knew or should have known that the trade secret was acquired by improper means. Md.Com.Law II Code Ann. § 11–1201(c)(1); *cf. Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv.*, 807 F.2d 1256, 1262 (5th Cir.) (elements of trade secrets claim under Texas law), *cert. denied*, 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987).[4] The essential element of a misappropriation claim is the "abuse of confidence or impropriety in the means of procurement." *Space Aero Prods. Co. v. R.E. Darling Co.*, 208 A.2d 74, 84 (Md.), *cert. denied*, 382 U.S. 843, 86 S.Ct. 77, 15 L.Ed.2d 83 (1965). The first *Restatement of Torts* clarified this distinctive feature of the law of trade secrets:

> The significant difference of fact between trade secrets and processes or devices which are not secret is that knowledge of the latter is available to the copier without the use of improper means to procure it, while knowledge of the former is ordinarily available to him only by the use of such means. It is the *employment of improper means to procure the trade secret, rather than the mere copying or use*, which is the basis of [liability].... Apart from breach of contract, abuse of confidence or impropriety in the means of procurement, trade secrets may be copied as freely as devices or processes which are not secret.

*Restatement (First) of Torts* § 757 cmt. a (1939) (emphasis added). We agree with the Second Circuit that the breach of a duty of trust or confidentiality comprises the core of actions for trade secret misappropriation, and "supplies the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying." *Computer Assocs.*, 982 F.2d at 717; *see also S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1090 n. 13 (9th Cir.1989) (trade secret misappropriation under California's UTSA is not preempted). Because Trandes's claim for trade secret misappropriation requires proof of a breach of trust or confidence, § 301 does not preempt the claim.

## II.

Atkinson next challenges the sufficiency of the evidence to support the jury verdict in Trandes's favor. In its motion for judgment as a matter of law, Atkinson raised two points. First, Atkinson contended that Trandes did not prove that it possessed any trade secrets. Second, Atkinson contended that even if Trandes did possess trade secrets, the evidence did not show that Atkinson ever acquired any of them. The district court rejected Atkinson's arguments and denied the motion. *Trandes Corp.*, 798 F.Supp. at 288.

We will not disturb the district court's decision "unless, without weighing the evidence or assessing witness credibility, we conclude that reasonable people could have returned a verdict only for defendants." *Cooper v. Dyke*, 814 F.2d 941, 944 (4th Cir. 1987). We must view the evidence in the light most favorable to Trandes, and must give Trandes the benefit of all inferences which the evidence fairly supports. *Id.* A scintilla of evidence is not enough to sustain the verdict. *Austin v. Torrington Co.*, 810 F.2d 416, 420 (4th Cir.), *cert. denied*, 484 U.S.

---

4. Although we conclude that this action is governed by the MUTSA, *see infra* Section III, the MUTSA was adopted " 'to codify and clarify the existing common law of trade secrets.' " *Optic Graphics, Inc. v. Agee*, 87 Md.App. 770, 591 A.2d 578, 585 n. 12 (quoting Peter B. Swann, Note, *Maryland Uniform Trade Secrets Act*, 49 Md.

L.Rev. 1056, 1056 (1990)), *cert. denied*, 324 Md. 658, 598 A.2d 465 (1991). The MUTSA may have somewhat broadened the scope of the law of trade secrets, *see Optic Graphics*, 591 A.2d at 585 n. 13, but it did not alter the essential nature of the action.

977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). Rather, there must be "sufficient evidence upon which a jury can properly proceed to reach a verdict." *Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985). We review the decision of the district court de novo. *Id.*

### A.

■■■ Atkinson first argues that no reasonable jury could have concluded that Trandes possessed any trade secrets. Maryland law defines a trade secret as

information, including a formula, pattern, compilation, *program*, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md.Com.Law II Code Ann. § 11–1201(e) (emphasis added). Prior to the adoption of the MUTSA, Maryland applied the *Restatement*'s definition of a trade secret. *See Space Aero*, 208 A.2d at 79. The *Restatement* defined a trade secret as

any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

*Restatement (First) of Torts* § 757 cmt. b. The *Restatement* set forth six factors for the court to consider in determining whether given information constitutes a trade secret:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with

which the information could be properly acquired or duplicated by others.

*Id.* "Although all of the Restatement's factors no longer are required to find a trade secret, those factors still provide helpful guidance to determine whether the information in a given case constitutes 'trade secrets' within the definition of the statute." *Optic Graphics*, 591 A.2d at 585. The existence of a trade secret is a conclusion of law based upon the applicable facts. *Operations Research, Inc. v. Davidson & Talbird, Inc.*, 241 Md. 550, 217 A.2d 375, 379 (1966).

■■■ Trandes argues that two aspects of the Tunnel System program constitute trade secrets: (1) the specific engineering formulas and methods of calculation embodied in the Tunnel System and (2) the structure and organization of the Tunnel System modules. Though both of the items could qualify as trade secrets, *see Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir.1990) (program architecture); *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir.1985) (empirical formulas), Trandes bore the burden of producing *some* evidence that these items met the definition of a trade secret. Trandes had to describe the subject matter of its alleged trade secrets in sufficient detail to establish each element of a trade secret. *See AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir.1987) (failure to identify specific trade secrets precluded injunctive relief against threatened disclosure); *Julie Research Lab., Inc. v. Select Photographic Eng'g, Inc.*, 810 F.Supp. 513, 519 (S.D.N.Y. 1992) (plaintiff bears burden of defining or identifying in detail its trade secrets); *qad, Inc. v. ALN Assocs., Inc.*, 18 U.S.P.Q.2d (BNA) 1122, 1124, 1990 WL 93362 and 1990 WL 106540 (N.D.Ill.1990) (recounting how the persistent failure to identify trade secrets had resulted in dismissal of claim). Although it was not necessary for Trandes to disclose all of the details of its trade secrets, it had to do more than merely allege that it had a "secret." *See Diodes, Inc. v. Franzen*, 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 24 (1968).

■■■ Here, Trandes averred nothing more than that it possessed secret "formulas." At trial, Trandes refused to provide any infor-

mation whatsoever about the formulas but instead chose to rely on mere conclusory allegations.[5] Without some evidence of what the formulas were, the jury could not have differentiated them from "matters of general knowledge in the trade," *id.*, and consequently Trandes did not sustain even a prima facie case of misappropriation. No rational jury could have concluded that the formulas were not generally known, that they had independent economic value, or that they were not readily ascertainable by proper means.

Trandes similarly failed to meet its burden of production with respect to the structure and organization of the Tunnel System modules. Trandes presented evidence that the Tunnel System had both a structure and an organization, but explained neither how the program was structured nor how it was organized. Without such evidence, no reasonable jury could have concluded that the structure and organization of the software was unique or was not generally known in the industry. Although the district court concluded that "the 'secret' is the combination and interrelationship of the six modules provided to WMATA, and the format of the Input Data Files used to run the System," and that "[t]here was sufficient evidence on which the jury could reasonably find that ... the design, use and interrelationship of these components was original and provided Trandes with a competitive advantage in the rapid transit industry," *Trandes Corp.*, 798 F.Supp. at 288, we cannot agree. Our independent

review of the record failed to reveal any evidence to support these conclusions. Trandes may very well possess unique information in its formulas and in the structure and organization of its programs, but it failed to prove that fact at trial.[6]

## B.

◼ Even though Trandes failed to prove that the structure and organization of the program qualified as a trade secret, it produced sufficient evidence for the jury to conclude that the Tunnel System software itself constituted a trade secret. We may affirm the district court's denial of judgment as a matter of law on this alternative ground.[7] *Dennison v. County of Frederick*, 921 F.2d 50, 53 (4th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2828, 115 L.Ed.2d 998 (1991); *see also T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir.) (affirming judgment notwithstanding the verdict on grounds not relied upon by the district court), *cert. denied*, —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991).

◼ Trandes created the Tunnel System in a two-step process. Brusse first wrote in the computer language BASIC a unique set of instructions designed to execute specific survey calculations associated with the construction of tunnels. *See* 17 U.S.C. § 101 (1988) (defining computer program as "a set of statements or instructions to be used di-

---

**5.** The following colloquy took place between defense counsel and James Brusse, president of Trandes:

 Q: Are the formulas that are utilized to make survey calculations in your tunnel system modules unique to you?
 A: Some are, sir.
 Q: And what are those?
 A: Do you want me to tell you?
 Q: Yes.
 A: I don't want to tell you. They're confidential, sir.

(Tr. at 69.) After the district court admonished Brusse to provide more information, Brusse attempted to elaborate, but his testimony amounted to nothing more than a series of assertions that his formulas were "different" and "unique." (*Id.* at 69–71.)

**6.** A plaintiff's general fear of disclosure cannot justify the failure to present sufficient evidence to identify its trade secrets. The MUTSA expressly imposes upon the courts the obligation to "pre-

serve the secrecy of an alleged trade secret by reasonable means," and provides explicit authority to accomplish that objective. *See* Md.Com. Law II Code Ann. § 11–1205 (authorizing protective orders in discovery, in-camera hearings, sealed records, and orders compelling parties to maintain secrecy).

**7.** Although Trandes does not specifically argue in its appellate brief that the software constituted a trade secret, it did press the argument both before the jury and in its opposition to Atkinson's motion for judgment as a matter of law. Because Atkinson has chosen to address this issue on appeal, it has suffered no prejudice. *See Estate of Whitt v. Commissioner*, 751 F.2d 1548, 1558 (11th Cir.) (court should affirm on alternative ground only in the absence of prejudice), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985).

rectly or indirectly in a computer in order to bring about a certain result."). This set of instructions is known as source code. *See Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1230 (3d Cir.1986) (describing source code), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). Once the source code was completed, it was then translated or "compiled" into a computer-readable form known as object code. "Object code is the binary language comprised of zeros and ones through which the computer directly receives its instructions." *Computer Assocs.,* 982 F.2d at 698; *see also Sega Enters., Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1514 n. 2 (9th Cir.1992) (description of compiling).

The source code can and does qualify as a trade secret. *See, e.g., University Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 534–35 (5th Cir.1974); *Barr–Mullin, Inc. v. Browning,* 108 N.C.App. 590, 424 S.E.2d 226, 229 (1993). The unique set of computer instructions that Trandes developed is information that (1) is not generally known, (2) is not readily ascertainable by proper means, and (3) if acquired by competitors would improve their ability to compete with Trandes. *See* Md.Com.Law II Code Ann. § 11–1201(e)(1). The source code is, to this day, completely secret. *See id.* § 11–1201(e)(2).

■ Whether the object code is a trade secret is a more difficult question.[8] Atkinson first contends that the object code cannot be a trade secret because it does not derive independent economic value from its secrecy, and therefore fails the first definitional requirement of a trade secret. *See id.* § 11–1201(e)(1). This argument has no merit.

Trandes generates most of its revenues by providing computer services to engineering firms and construction companies. Trandes receives raw data from its clients, processes the data with the Tunnel System software, and reports the results back to the clients. These services generate substantial revenues, enabling Trandes to earn more than one million dollars on a single contract. Armed with a copy of the object code, an individual would have the means to offer much the same engineering services as Trandes.[9] Because "other persons [could] obtain economic value" from the disclosure or use of the object code, a reasonable jury could conclude that the Tunnel System object code "[d]erives independent economic value ... from not being generally known." [10] *Id.; cf. ISC–Bunker Ramo Corp. v. Altech, Inc.,* 765 F.Supp. 1310, 1323–26, 1333 (N.D.Ill. 1990) (object code is trade secret), *later proceeding,* 765 F.Supp. 1340 (N.D.Ill.1990); Robert C. Scheinfeld & Gary M. Butter, *Using Trade Secret Law to Protect Computer Software,* 17 Rutgers Computer & Tech.L.J. 381, 383 (1991) (object code can be a trade secret).

■ Atkinson next argues that the object code cannot be a trade secret because Trandes did not keep it secret, and it therefore fails the second definitional requirement of a trade secret. *See* Md.Com.Law II Code Ann. § 11–1201(e)(2). Section 11–1201(e)(2) requires the owner of trade secret information to undertake "efforts that are reasonable under the circumstances" to maintain the secrecy of its information. Atkinson asserts that the Tunnel System has been widely disclosed as a mass-marketed product and that its existence and its abilities are not secret. Atkinson relies heavily on the fact

---

8. This case presents an unusual set of facts. In the ordinary case, the owner of trade secret computer software will maintain the secrecy of the source code but freely distribute the object code. *See, e.g., Q–Co Indus., Inc. v. Hoffman,* 625 F.Supp. 608, 617 (S.D.N.Y.1985) (program secret where source code secret, even though object code not secret). In such cases, the owner of the software cannot claim trade secret protection for the object code because its disclosure to the public destroyed its secrecy. In this case, however, Trandes maintained the secrecy of the source code *and* the object code, as we explain below.

9. Brusse obtained specific promises from each of his licensees that they would not provide computer services to other parties.

10. Similarly, the object code is "information which is used in [Trandes's] business, and which gives [Trandes] an opportunity to obtain an advantage over competitors who do not know or use it." *Restatement (First) of Torts* § 757 cmt. b.

that Trandes once placed a two-inch advertisement for the Tunnel System in the back of an engineering periodical. The advertisement described in general terms the capabilities of the Tunnel System and offered a demonstration disk for $100. The demonstration disk did in fact contain an object-code version of the Tunnel System, but was configured to operate in demonstration mode only. The advertisement generated six or seven inquiries, none of which resulted in the sale or shipment of a demonstration disk. Atkinson argues that these actions destroyed the secrecy of the Tunnel System.

Secrecy is a question of fact, *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir.1986), and our review is limited to whether a rational jury could conclude that Trandes took reasonable precautions to keep the Tunnel System object code secret. Trandes took steps to ensure that its employees would not disclose or improperly use its computer programs. Trandes licensed only two complete versions of the Tunnel System object code and extracted promises from both recipients that they would neither copy nor transfer the program, nor use the program for any purpose other than their own construction or engineering projects. *See J & K Computer Sys., Inc. v. Parrish*, 642 P.2d 732, 735 (Utah 1982) (distribution of computer program to a few customers does not extinguish the secrecy of the program where distributed programs contained notices that the programs were for use by authorized licensees only); 1 Milgrim, *supra,* § 5.03[8][c], at 5–125 (trade secrets may be leased without destroying secrecy). Trandes also prevented unauthorized access to both the in-house and licensed versions of the software by using a system of passwords. *See Com–Share, Inc. v. Computer Complex, Inc.*, 338 F.Supp. 1229, 1234–35 (E.D.Mich. 1971) (passwords enhance secrecy), *aff'd,* 458 F.2d 1341 (6th Cir.1972). Finally, the evidence at trial demonstrated that, with the exception of Atkinson, no other unauthorized person ever obtained a copy of the software.

 On these facts, the jury could have reasonably concluded that Trandes undertook reasonable efforts to maintain the secrecy of the Tunnel System. Although Trandes may not have achieved absolute secrecy, "[a]bsolute secrecy is not essential." *Space Aero,* 208 A.2d at 82. It is enough that Trandes made it difficult for others to acquire copies of the Tunnel System software through proper means. *Id.* The advertisement of the software, contrary to Atkinson's assertions, did nothing to compromise the secrecy of the object code. Although Trandes did give WMATA a single demonstration disk in contemplation of a licensing agreement, it did so only in confidence. Such limited disclosure does not destroy secrecy. *See id.* at 82 ("A trade secret owner, however, does not abandon his secret by a limited public publication for a restricted purpose."); *see also Speedry Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 332 (2d Cir.1962) (trade secret owner may disclose his secret during licensing negotiations without destroying secrecy); *cf. Hoeltke v. C.M. Kemp Mfg. Co.*, 80 F.2d 912, 923 (4th Cir. 1935) (confidential relationship implied where plaintiff disclosed invention to defendant in contemplation of sale), *cert. denied,* 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395 (1936). Viewing the evidence in the light most favorable to Trandes, the jury was entitled to conclude that the Tunnel System object code was the subject of reasonable efforts to maintain its secrecy.

Trandes put sufficient evidence before the jury to justify a conclusion that the Tunnel System object code constituted economically valuable information and that Trandes took reasonable precautions to keep it secret. Because the object code meets the definitional requirements of both § 11–1201(e)(1) and (e)(2), it qualifies as a trade secret.

### C.

 It is undisputed that Atkinson acquired and used the Tunnel System object code.[11] Atkinson nevertheless contends that its acquisition of Trandes's trade secret ob-

11. Trandes does not argue that Atkinson ever acquired the source code. Indeed, Trandes contends that "[t]he 'source code' ... was kept se-

cured and never given to any firm or individual." (Trandes's Br. at 19.)

ject code does not constitute misappropriation because it did not use the object code to compete with Trandes. Here, Atkinson ignores the language of the statute. The MUTSA does not require proof of competition, but only proof of improper acquisition or improper use. *See* Md.Com.Law II Code Ann. § 11–1201(c); *cf. Schalk v. State,* 767 S.W.2d 441, 449 (Tex.Crim.App.1988) (acquisition without use constituted theft of trade secrets), *aff'd* 823 S.W.2d 633 (Tex.Crim. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1763, 118 L.Ed.2d 425 (1992); *Computer Print Sys., Inc. v. Lewis,* 281 Pa.Super. 240, 422 A.2d 148, 154 (1980) (mere acquisition of computer programs through breach of duty of confidentiality creates liability); *Restatement (First) of Torts* § 757 cmt. c (mere disclosure enhances risk of adverse use and may reduce value of trade secret). Consequently, Atkinson's improper acquisition and use of the object code constitutes a misappropriation in violation of the MUTSA.

### D.

Atkinson next argues that its acquisition and use of the Tunnel System was not improper because it complied with the terms of WMATA's license. The license permitted Atkinson, as a contractor of WMATA, to use the Tunnel System if WMATA obtained Trandes's express written approval. Atkinson admits that neither it nor WMATA sought or obtained Trandes's approval for the transfer of the software to Atkinson. Still, Atkinson argues that the written approval requirement was not a condition precedent to WMATA's right to transfer the software to Atkinson, and that even if the written approval requirement is a condition precedent, Trandes waived compliance.

Atkinson presented neither of these arguments to the district court and has therefore waived them on appeal. *See National Wildlife Fed'n v. Hanson,* 859 F.2d 313, 318 (4th Cir.1988) ("we ordinarily will not consider issues raised for the first time on appeal"); *National Fidelity Life Ins. Co. v. Karaganis,* 811 F.2d 357, 360 (7th Cir.1987) ("A ground for reversal may be presented for the first time on appeal only if it involves a question of jurisdiction or if there are exceptional circumstances requiring as a matter of justice that the waiver rule be set aside.").

### III.

Finally, we address the district court's denial of Atkinson's motion for remittitur of the punitive damages award. *Trandes Corp.,* 798 F.Supp. at 290. At the close of the evidence, the district court submitted the issue of punitive damages to the jury and its instructions elicited no objection. The jury awarded compensatory damages in the amount of $17,400 and punitive damages in the amount of $750,000.

After the verdict, Atkinson moved for remittitur of the punitive damages award on the basis that the award of $750,000 exceeded the statutory cap, which, if applicable, would limit punitive damages to twice compensatory damages, or $34,800. Md.Com. Law II Code Ann. § 11–1203(d). Atkinson also contended that no punitive damages were warranted because Trandes failed to prove by clear and convincing evidence that Atkinson had willfully and maliciously misappropriated its trade secrets. Finally, Atkinson argued that under the MUTSA the imposition of punitive damages was an issue for the court, not the jury.

Sensing that its award of punitive damages was endangered, Trandes filed a motion under Federal Rule of Civil Procedure 15(b) to amend the pleadings to conform to the evidence. In its motion, Trandes asserted for the first time that the MUTSA did not apply to its trade secrets claim because the act of misappropriation was a continuing misappropriation beginning before July 1, 1989, the effective date of the MUTSA. 1989 Md. Laws 598, §§ 2(2) & 3. Atkinson opposed the motion on the ground that the evidence did not support a finding that it misappropriated Trandes's trade secrets before July 1, 1989.

The district court found that Atkinson engaged in a continuing misappropriation commencing before July 1, 1989, and, in accordance with the common law, imposed punitive damages in the amount assessed by the jury. *Trandes Corp.,* 798 F.Supp. at 289–90. The court found that clear and convincing

evidence supported the jury's award. *Id.* at 289.

We first address Atkinson's contention that the district court should never have submitted the issue of punitive damages to the jury but instead should have reserved the issue for its own determination. Md.Com. Law II Code Ann. § 11–1203(d) (punitive damages are to be awarded by the court). Although Atkinson correctly interprets the Maryland statute, it overlooks the fact that, in federal court, any award of punitive damages presents a factual question that must be resolved by the jury. *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416 (4th Cir.1992) (en banc); *Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.*, 938 F.2d 502, 507 (4th Cir.1991) (en banc). Consequently, the district court properly submitted the issue of punitive damages to the jury.

Next we address whether sufficient evidence supports the jury's finding that Atkinson willfully and maliciously misappropriated Trandes's trade secrets. The district court did not instruct the jury that Trandes must establish the basis for an award of punitive damages by "clear and convincing evidence," *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633, 657 (1992), but Atkinson failed to object to the court's instructions and thereby waived the "clear and convincing evidence" standard. Fed.R.Civ.P. 51. Nonetheless, the evidence is clear that Atkinson's actions were both willful and egregious. *See Fairfax Sav. F.S.B. v. Ellerin*, 94 Md.App. 685, 619 A.2d 141, 152–53 (intentional torts require proof of actual malice, which can be shown by gross or egregious conduct), *cert. granted*, 329 Md. 756, 621 A.2d 897 (1993); *cf. Zenobia*, 601 A.2d at 653 n. 21. As the district court pointed out, numerous Atkinson employees knew or had reason to know that Atkinson was not authorized to use the Tunnel System software, and yet Atkinson modified the program to misrepresent that Atkinson was an authorized user. *Trandes Corp.*, 798 F.Supp. at 289.

Atkinson employees also effaced Tunnel System printouts to conceal the fact that the program belonged to Trandes. This evidence entitled the jury to conclude that Atkinson's misappropriation had been willful and malicious.

Finally, we must address whether the statutory cap applies. The cap applies if the misappropriation occurred after July 1, 1989. The date of misappropriation is a question of fact, and we may set aside the district court's factual finding only if it is clearly erroneous. Fed.R.Civ.P. 52(a).[12] To support its finding of a continuing misappropriation, the district court identified only four pieces of evidence that could conceivably show that Atkinson acquired the Tunnel System before July 1, 1989. First, the court mentioned the fact that the Tunnel System was available in WMATA's on-site trailer at the time that Atkinson began work on the project in 1988. Second, the court credited an employee's testimony that Atkinson was using the software as early as August 1989. To infer that Atkinson acquired the Tunnel System before July 1, 1989 requires conjecture and speculation, and the evidence is simply insufficient to support the district court's conclusion.

The remaining evidence cited by the district court similarly fails to support its finding. The district court relied on the testimony of an Atkinson employee that he joined Atkinson in June 1989 and "was introduced to the Tunnel System" by his supervisor. *Trandes Corp.*, 798 F.Supp. at 289. The same employee later made it clear, however, that he was not introduced to the software until May 1991. Finally, the district court relied on Atkinson's admission that since at least March 1989 its employees had used Tunnel System reports *"generated by Atkinson* or provided to Atkinson by WMATA." *Id.* (emphasis added). It is uncontested that WMATA provided Atkinson's employees with Tunnel System reports as early as March 1989. The district court nonetheless inferred

---

12. Because the date of misappropriation is a factual question, it should have been submitted to the jury. Atkinson failed, however, to object to the omission of this issue from the special verdict form and thereby waived its right to a

jury trial on the issue. Fed.R.Civ.P. 49(a). In accordance with Rule 49(a), the district court made its own finding. *Trandes Corp.*, 798 F.Supp. at 290.

 

from the admission that Atkinson "generated" reports with the Tunnel System program as early as March 1989, and therefore must have acquired the software before March 1989. This single admission by Atkinson is, however, so laden with ambiguity that it cannot support the district court's conclusion.

Indeed, the remaining evidence strongly suggests the opposite conclusion. Atkinson's project engineer testified that he overheard an employee of WMATA offer the Tunnel System software to an Atkinson supervisor in March 1990, and that he later witnessed the WMATA employee transfer several disks to the Atkinson supervisor. Moreover, WMATA's survey coordinator testified that he first trained the Atkinson supervisor in the use of the Tunnel System on November 21, 1990, and the record before us contains no evidence that Atkinson generated any Tunnel System reports before January 20, 1991.

Although there may be a modicum of evidence to support the district court's conclusion that Atkinson acquired the Tunnel System before July 1989, our independent review of the evidence leaves us with a definite and firm conviction that a mistake has been made. *Friend v. Leidinger,* 588 F.2d 61, 64 (4th Cir.1978). The clear weight of the evidence indicates that Atkinson did not misappropriate the software until after July 1, 1989. *See O'Brien v. Papa Gino's of Am., Inc.,* 780 F.2d 1067, 1076 (1st Cir.1986) (factual findings are clearly erroneous if against the clear weight of evidence). Thus, because the misappropriation took place after July 1, 1989, Trandes's claim is subject to the provisions of the MUTSA, and the statutory cap applies. Md.Com.Law II Code Ann. § 11–1203(d). We therefore reverse the district court's denial of Atkinson's motion for remittitur of the punitive damage award, and remand for the district court to award punitive damages in accordance with § 11–1203(d).

## IV.

In sum, we affirm the district court's denial of Atkinson's motion for judgment as a matter of law. Trandes's claim for trade secret misappropriation is not preempted by § 301(a) of the Copyright Act, and the jury could have reasonably concluded that Atkin-

son acquired Trandes's trade secret object code in violation of Maryland law. We reverse the district court's denial of Atkinson's motion for remittitur and remand for an award consistent with § 11–1203(d).

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*