**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RONALD R. EADES,
Plaintiff-Appellant,

v.                                                          No. 97-2510

UNITED STATES OF AMERICA,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
G. Ross Anderson, Jr., District Judge.
(CA-96-3809-6-13)

Argued: December 3, 1998

Decided: January 22, 1999

Before LUTTIG, WILLIAMS, and TRAXLER,
Circuit Judges.

_____

Reversed and remanded by unpublished opinion. Judge Luttig wrote
the opinion, which Judges Williams and Traxler joined.

_____

**COUNSEL**

**ARGUED:** Douglas Franklin Patrick, Sr., COVINGTON, PATRICK,
HAGINS & LEWIS, Greenville, South Carolina, for Appellant. Lee
Ellis Berlinsky, Assistant United States Attorney, Greenville, South
Carolina, for Appellee. **ON BRIEF:** J. Rene Josey, United States
Attorney, Greenville, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

LUTTIG, Circuit Judge:

Ronald Eades appeals a district court judgment that South Carolina workers' compensation law bars his tort suit against the United States under the Federal Tort Claims Act. For the reasons that follow, we agree that South Carolina law controls, but hold that it does not bar Eades' suit.

I.

Eades was electrocuted while testing the electrical system at a Veterans Administration hospital in Fayetteville, North Carolina. He alleges that while he was testing a particular circuit, an employee of the hospital negligently switched it on, transmitting electricity through the circuit. Eades sued the hospital in tort over this incident.

Instel, Inc., a South Carolina company that performs electrical testing, employed Eades at the time of the incident. Eades is a South Carolina resident and performed most of his work for Instel in South Carolina. His employment contract with Instel was entered into in South Carolina. The hospital, whose "primary mission . . . is to provide quality patient care to our nation's veterans," J.A. 200, contracted with Instel to perform the triennial electrical testing required by Veterans Administration regulations. The regulations require such testing to be performed by someone certified by the National Electrical Testing Association ("NETA"). Under the hospital's contract with Instel, Instel was only to test for, not to repair, any defects or deterioration.

Under the contract, Instel also agreed to provide "Workman's Compensation and employer's Public Liability Insurance in accordance with the laws of the State of North Carolina." Accordingly, Instel purchased a policy with an insurance agency in South Carolina,

2

which, pursuant to both the testing contract and the requirements of North Carolina law, provided a certificate of coverage to the hospital. See N.C. Gen. Stat. § 97-19.

After his injury, Eades filed for and received workers' compensation benefits in South Carolina through Instel's policy. He then sued the hospital in South Carolina under the Federal Tort Claims Act ("FTCA"). The district court held that North Carolina's tort law and choice of law rules governed, pursuant to the FTCA's requirement to apply "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), but further held that North Carolina would look to South Carolina workers' compensation law to determine whether Eades could sue the hospital. Applying that law, the district court concluded that the hospital was Eades' "statutory employer" and thus shielded from suit. It therefore granted the hospital's motion for summary judgment.

Eades argues on appeal, as he did below, that North Carolina law applies wholesale -- both because the district court misinterpreted North Carolina's choice of law rules and because the contract between Instel and the hospital contemplates that North Carolina workers' compensation law will apply -- and that, even if South Carolina workers' compensation law applies, the hospital is not Eades' "statutory employer." The parties agree that Eades may sue if North Carolina workers' compensation law applies.

II.

Eades first argues that North Carolina workers' compensation laws should govern his right to sue. We disagree, and affirm the district court's conclusion that North Carolina would look to South Carolina on this question.

Under the FTCA, the federal government has largely waived its sovereign immunity from tort liability. In so doing, however, it has not crafted new tort law, but rather has acquiesced to that of the States, allowing suits against itself "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added). See 28 U.S.C.

3

§ 2674 (stating that United States "shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances"). The Supreme Court has interpreted "law of the place" to mean the "whole law of the State where the act or omission occurred" -- that is, not just its "internal" substantive law but also its choice of law rules. <u>Richards</u> v. <u>United States</u>, 369 U.S. 1, 11 (1962). Therefore, because the "act or omission" in this case occurred in North Carolina, that State's law governs.

Under North Carolina choice-of-law rules, when an employee is covered by workers' compensation, his right to sue a third party in tort is governed by the workers' compensation law of the State where he is based. <u>Braxton</u> v. <u>Anco Electric, Inc.</u>, 409 S.E.2d 914, 915 (N.C. App. 1991). To determine which State that is, North Carolina considers where that employee usually works, where he resides and is domiciled, where his contract of employment was made, and where he has received workers' compensation benefits (if he has received such). This last factor appears to be the most important. <u>See id</u>. at 915-16.

Although the court in <u>Braxton</u> said that it looks "to the law which guarantees [the worker's] receipt of those benefits" and the State where the worker is "covered," <u>id</u>. at 915, we find this language unhelpful, since a worker injured outside his home State usually has a choice between filing for benefits in his home State or in the State where he was injured, or both. <u>See</u> N.C. Gen. Stat. § 97-36 (allowing compensation to person injured outside of North Carolina if employment is based in North Carolina, and allowing some compensation even if person has secured compensation in the State of injury). Be that as it may, in this case the <u>Braxton</u> factors point to South Carolina law as the governing law: Eades' contract of employment was entered into there, and he resides there; Instel is based there; Eades did most of his work there; and he collected benefits there.

We acknowledge that this rule flies in the face of the normal rule of lex loci delicti for tort suits, a rule to which North Carolina generally has a "steadfast commitment," <u>Gbye</u> v. <u>Gbye</u>, 503 S.E.2d 434, 435 (N.C. App. 1998). But the court in <u>Braxton</u> was well aware of this, and consciously bifurcated the choice-of-law question. It acknowledged that lex loci was a "long established doctrine" and held that it controls the choice of law for the underlying tort suit. 409

S.E.2d at 915. But immediately after so acknowledging, it laid down the exception for the "exclusive remedy bar" of workers' compensation, id., and it did so over a dissent that argued for application of lex loci wholesale. See id. at 917 (Meyer, J., dissenting) (criticizing majority's reasoning as "circular" and as a "bald, yet unstated, disavowal of our well-settled choice of laws doctrine").

Therefore, we hesitate to conclude, as Eades would have us do, that any decision subsequent to Braxton has rejected it unless that decision explicitly so states. In particular, we disagree with his argument that the two decisions in Frugard v. Pritchard, 434 S.E.2d 620 (N.C. App. 1993), rev'd., 450 S.E.2d 744 (N.C. 1994), implicitly overrule Braxton.

The relevant issue in Frugard, a tort suit, was whose law governed the admissibility of a workers' compensation settlement. The Court of Appeals held that this was procedural and thus that the law of the forum governed. 434 S.E.2d at 625. It mentioned Braxton only for the point that the "substantive law" should be that of the State where the plaintiff had workers' compensation. Id. at 624. This latter point, besides being wrong -- Braxton retained lex loci delicti for choosing the substantive law -- also was irrelevant to the evidentiary question, and therefore dicta.

The Supreme Court agreed that the law of the forum governed the evidentiary question, but reversed because the exclusion of the settlement was "invited error." 450 S.E.2d at 746. It also corrected the Court of Appeals' dicta regarding the applicable "substantive law," citing Braxton for the proposition that the substantive law of the place of the accident governed. Id. at 745. Thus the rule of Braxton regarding the workers' compensation bar to suits was irrelevant to Frugard, and the Supreme Court, by its understandable silence on the issue, did nothing to draw that holding into doubt. We therefore see no reason to question the vitality of Braxton, and must conclude that North Carolina would apply South Carolina workers' compensation law in determining whether Eades can sue the Hospital.

Eades argues, however, that notwithstanding Braxton, the contractual language requiring Instel to secure "Workman's Compensation

5

. . . in accordance with the laws of the State of North Carolina" requires us to apply North Carolina law. We disagree.

Admittedly, Braxton itself does not bar a contractual choice-of-law clause on this question; but that is because there was no such contract at issue there, since the suit was by an employee of one subcontractor against another subcontractor, rather than, as here, by an employee of a contractor against the party that let the contract. See 409 S.E.2d at 914. Further, neither the district court nor the hospital has weighed in on this question, although Eades properly raised it below, see J.A. 204-05, and has reiterated it on appeal. The hospital's chief argument to the district court was that this language was mere "boilerplate," J.A. 221, but choice-of-law clauses are usually boilerplate and are not, for that reason, any less valid. See Johnston County v. R.N. Rouse & Co., Inc., 414 S.E.2d 30, 33 (N.C. 1992).

We find guidance in one of the three cases on which Braxton relied, Liberty Mutual Ins. Co. v. Goode Construction Co., 97 F. Supp. 316 (E.D. Va. 1951). See Braxton, 409 S.E.2d at 916. The facts of Goode almost exactly parallel those here, except for the States involved: a plaintiff who resided, worked, and made his contract of employment in the District of Columbia for a District employer was injured in Virginia while working for his employer, who was a subcontractor on the Virginia project. He collected workers' compensation benefits in the District, then sued the general contractor in tort. The court applied the workers' compensation law of the District to determine whether to allow the suit. It rejected an argument identical to Eades' (although there made by the defendant):

> The burden of the defendant here is that in preparation for the performance of the construction contract in Virginia, it fully complied with the laws of that State relating to compensation for industrial accidents, securing, and by its contract requiring its subcontractor . . . to secure, insurance for the payment of all such claims; and that consequently its liability should be restricted to the liability fixed by its compensation laws.

97 F. Supp. at 317. The court responded that the key contract was the plaintiff's employment contract with his employer, not that between

6

the defendant contractor and the plaintiff's employer. The latter contract could not affect the rights of a non-party. Id. We conclude therefore, based on Braxton's reliance on Goode, that North Carolina would reason likewise, disregard such contractual language, and apply the rule of Braxton.**1**

III.

Having determined that South Carolina workers' compensation law governs Eades' right to sue, we turn to that law and conclude that the hospital was not Eades' "statutory employer." Because Eades is therefore free to bring suit, we reverse the district court's entry of summary judgment and remand for further proceedings.

South Carolina bars tort suits by an employee against an employer when workers' compensation covers that employee. S.C. Code § 42-1-540. This bar extends to "statutory employers" -- those who do not employ the plaintiff but are treated as if they did. The rationale is to prevent evasion of the workers' compensation laws via subcontracting. Glass v. Dow Chemical Co., 482 S.E.2d 49, 50 n.1 (S.C. 1997). When an entity contracts out work, it is a statutory employer of any employees of the subcontractor who perform work that involves "part of [the] trade, business or occupation" of that entity. S.C. Code § 42-1-400. South Carolina courts have interpreted this provision as covering activities that

_____

**1** The Fourth Circuit has since held that Goode's interpretation of Virginia's choice-of-law rules "no longer has validity." Garcia v. Pittsylvania County Service Auth., 845 F.2d 465, 468 (4th Cir. 1988). But Braxton's key reasoning did not involve Virginia law, even though it bolstered its holding by looking to Virginia law and applying renvoi, and in so doing appears to have misinterpreted Virginia law. See Garcia, 845 F.2d at 467 (holding that Virginia now applies lex loci delicti for determining whether workers' compensation bars a suit). More importantly, because Braxton was decided well after Garcia, we assume that the North Carolina Court of Appeals, in deciding to rely on Goode, was aware of Garcia and the cases on which it relied, but concluded that the reasoning of Goode had merit for purposes of North Carolina law even though Virginia law has since changed.

7

> (1) are an important part of the trade or business of the employer, (2) are a necessary, essential, and integral part of the business of the employer, or (3) have been previously performed by employees of the employer.

Glass, 482 S.E.2d at 50. (The "employer" in this language is the alleged statutory employer, not the subcontractor.) The court in Glass recently further refined the first two tests to require asking whether the work at issue is part of the entity's "basic operation." See 482 S.E.2d at 51.

The district court held that the hospital satisfied both (1) and (2) (only one being necessary to qualify), and so it did not consider (3). The hospital contends that it satisfies all three.

Although each case is fact-sensitive, id. at 51; Raines v. Gould, Inc. 343 S.E.2d 655, 659 (S.C. App. 1986), one can discern some trends and general categories. First, "construction work," including electrical installations, is usually not part of the "business of the employer" under the first two tests, unless that employer maintains a separate division for such matters or carries out construction "more or less" perpetually (such as a utility constructing power plants or erecting transmission lines). See Raines, 343 S.E.2d at 657-58 (holding that employee of subcontractor installing electrical system at battery plant being constructed for defendant was not defendant's statutory employee).

Second, intermittent repairs to physical plant are generally not part of the "business of the employer," but regular and frequent maintenance is. See Glass, 482 S.E.2d at 52 (distinguishing precedent based on "the frequency of service and repairs that the[ ] defendant anticipated" and noting that activity involved in case "happens only occasionally"). The scope or nature of the repair or maintenance affects this question: a "major" repair or one requiring "technical knowledge that was highly specialized" is less likely to be part of the "business of the employer." Id. at 51. But if the "basic operation" of the business "is dependent on" the work at issue, or if the work is "related to the basic operation" of the business, that work is more like regular maintenance and thus more important to the business of the employer. See Glass, 482 S.E.2d at 51; Raines, 343 S.E.2d at 659 ("[The record does

8

not indicate the work being performed by Raines . . . was an integral part of [battery manufacturer's] operations without which it cannot function.").

Third, whether the business ever does or could perform such work with its own employees is relevant to whether that work is part of its business, even though that is technically a separate (third) test. See Glass, 482 S.E.2d at 51-52 (stating that "where repairs are . . . of the sort which the employer is not equipped to handle with its own work force, they are not part of the business"); Raines, 343 S.E.2d at 657 (citing cases). And just because a company has used its own employees for work of a lesser degree than that at issue does not make it a statutory employer. See Raines, 343 S.E.2d at 657, 659. But work may still be integral to a company's basic operations even if the company's own employees do not perform it, where the company "cannot function" without that work. Id. Cf . Woodard v. Westvaco Corp., 433 S.E.2d 890, 895 (S.C. App. 1993) (holding manufacturer to be a statutory employer because transportation of chemical in question was necessary to continue normal production).

Applying these factors, we are confident that the hospital was not Eades' statutory employer. The basic operation of the hospital, in the hospital's own words, is "patient care." J.A. 200. The work of Eades and Instel is electrical testing, only indirectly related to this basic operation both in kind and in importance. Had Instel not performed the electrical testing, the hospital's operations would not have faced any immediate interruption, or any likely interruption in the foreseeable future. A power outage due to a hurricane or a bolt of lightning is more likely to disrupt the hospital's electrical current than is failing to perform triennial testing. Even had there been a threat of interruption, Instel's contract barred it from performing the necessary repairs, so the hospital can hardly argue that the necessity of hypothetical repairs by a third party shows that Instel's checking for that necessity is part of the hospital's basic operation.

Further, although this testing does occur regularly, it is surely sporadic, occurring only once every three years. This is barely even "occasional[ ]," Glass, 482 S.E.2d at 52. And, again, the basic operation of the hospital's business does not depend on or relate to this triennial

9

testing. Instel does nothing to affect the day-to-day operations of the hospital.

Finally, the hospital's employees do not perform this testing nor are they capable of doing so. The hospital's employees lack the NETA certification that Veterans Administration regulations require for performing this testing, and even if they had such certification, the hospital lacks the financial resources "to invest in the expensive testing equipment" necessary for the testing. In addition, as noted above, it is not dispositive that hospital employees perform lesser electrical maintenance or inspection. See Raines, 343 S.E.2d at 657, 659. The policy behind the statutory employer doctrine, Glass, 482 S.E.2d at 50 n.1, reinforces this point. If the hospital is incapable of performing this work, for both regulatory and financial reasons, we need not fear that the hospital, in contracting it out, is attempting to evade the workers' compensation law.

We think it irrelevant, one way or the other, that Veterans Administration regulations mandate that the hospital have this testing performed. Both the district court and the hospital raise this argument, but without citing any authority. One could argue, although they did not, that compliance with legal requirements is a"necessary [or] essential . . . part of the business of the employer," because failure to comply may lead to government-mandated termination of operations. On the other hand, in Glass the work at issue was performed under legal compulsion of a sort -- to avoid litigation-- and the court did not even suggest that this pointed toward statutory employer status. Quite the contrary. See Glass, 482 S.E.2d at 51 ("Workers' activities were not related to the basic operation of Dow's business. . . . Instead, [they] stemmed simply from Dow's desire to avoid litigation costs."). Further, to sanction this argument is to create an incentive for the government to write its regulations with an eye toward desirable status under workers' compensation laws. If this factor were to matter at all, it would only be where a generally applicable law was at issue, not where, as here, self-imposed regulations mandate an action.

For these reasons, Instel's work at the hospital, even if we considered it "part of the business" of the hospital, was neither "an important part" nor "a necessary, essential, and integral part" of that business. Likewise, the hospital cannot satisfy the third test, because its

10

employees have not "previously performed" the key testing that Instel performs. If Instel's electrical testing qualified the hospital as the "statutory employer" of Instel's employees-- perhaps on the argument that the hospital needs electricity to perform its basic operation and without testing it cannot be sure that it will have that electricity -- we strain to imagine what contracting out of work would not likewise qualify. Most any sort of repair or inspection, if neglected long enough, will eventually impair a business' operation.

The above discussion distinguishes our decision in Singleton v. J.P. Stevens & Co., Inc., 726 F.2d 1011, 1013 (4th Cir. 1984), on which the district court relied. We there held that under South Carolina law repairs of electrical lines for a textile plant, during which the plant closed completely, were an essential part of the textile company's business. Raines cited Singleton for exactly this narrow point. Raines, 343 S.E.2d at 658 & n.6 (citing Singleton for the proposition that work "may be considered a part of [a business's] trade or business if the work is an integral part of its operations without which it cannot function"). Singleton, unlike the instant case, involved actual repairs of damaged lines. Those widespread damages -- to "all of the high voltage cables" at the plant, 726 F.2d at 1012-- directly threatened the basic operation of the plant, and the repairs required a halt to that operation. Further, Singleton predated the South Carolina courts' creation of the three-fold test for the statutory employer doctrine and the apparent narrowing of that doctrine in Glass.**2**

_____

**2** Eades further argues, for the first time at oral argument on appeal, that the hospital may not avail itself of South Carolina's statutory employer defense where it has not likewise availed itself of South Carolina's workers' compensation laws, citing Harrell v. Pineland Plantation, Ltd., 494 S.E.2d 123 (S.C. App. 1998), cert. granted (Aug. 20, 1998). Because the applicability of the statutory employer defense is a jurisdictional question, see Glass, 482 S.E.2d at 51, Eades has not waived this argument, see Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 665 (4th Cir. 1993). But because we have concluded on other grounds that the hospital is not Eades' statutory employer, and because an appeal of Harrell is pending, we see no reason to reach this question.

11

CONCLUSION

Because the hospital is not Eades' statutory employer under South Carolina law, Eades is free to bring his suit against the hospital. We therefore reverse the judgment of the district court to the contrary and remand for further proceedings.

REVERSED AND REMANDED

12